## STATE v. WAYNE EDWARD BUTLER.

(Filed 1 March, 1967.)

**1. Criminal Law § 50—**

Testimony of a witness that defendant shot the deceased persons is not rendered incompetent because the witness was in an adjoining room and could not see the shots actually fired, when the testimony of the witness further discloses that she heard the shots, heard one of the victims accuse defendant of having shot him, heard defendant state that he had shot him and was going to shoot the rest, and that defendant immediately came into the room where the witness was and shot her, etc., so that it is apparent from the record that the witness was testifying to facts within her knowledge, gathered from the use of her other senses, actual vision not being an absolute requirement under such condition.

**2. Criminal Law § 71—**

Where the court, on the *voir dire*, excludes testimony of a statement of defendant, there is no occasion for cross-examination by defendant in regard thereto.

**3. Criminal Law § 43—**

Where there is testimony that a photograph introduced in evidence was an accurate representation of the scene, the court properly admits such photograph for the purpose of illustrating the testimony of the witness.

**4. Criminal Law § 71—**

The ruling in *Miranda v. Arizona*, 384 U.S. 436, has no application to a trial had prior to the date of the rendition of that decision, and where there is no claim by the defendant that he was denied counsel, and the affirmative evidence is to the effect that defendant was informed of his constitutional rights and that he did not have to make a statement, testimony of defendant's statement is competent.

**5. Same—**

An exculpatory statement of defendant is not a confession, even though it be in contradiction of the testimony of defendant at the trial, and the rules governing the admissibility of confessions are not germane.

**6. Criminal Law § 162—**

Where the court immediately sustains objection to questions asked defendant by the solicitor, defendant has sustained no prejudice, the questions not being patently unfair or improper and the testimony sought to be elicited by them being merely incompetent for technical reasons.

**7. Criminal Law § 116—**

It is not error for the court, after the jury had failed for several hours to reach a verdict, to urge the jurors to agree upon a verdict when the record discloses that the court cautioned them that they should reconcile their differences of opinion only if they could do so without any one of them surrendering his conscientious convictions in the matter.

APPEAL by defendant from *Johnson, J.*, at March 14, 1966, Criminal Term of SCOTLAND Superior Court; argued at Fall Term, 1966, as No. 828.

STATE v. BUTLER.

The defendant was convicted of murder in the second degree in case No. 2538 in which Geraldine McDaniel Brown was killed on 18 November, 1965, and in case No. 2539 in which Junior Moore Gibson died. In #2538 he was given a prison sentence of not less than 25 nor more than 30 years, and in #2539 not less than 15 nor more than 20 years — the sentences to run consecutively.

The evidence for the State tended to show that the deceased, Geraldine Brown, and her four children lived in an eight-room house near Laurel Hill, and that the defendant Butler had been living there several months. Junior Moore (Boots) Gibson came there on 18 November, 1965, and he and Ed Butler went off to borrow some money for Butler. They were not successful and the defendant returned about midnight, mad at Geraldine because she hadn't told him something he thought he ought to know. He cursed her and then started shooting with a rifle. After about a dozen shots had been fired Geraldine was found dead on the floor and Boots was dead in a kitchen chair. The defendant also shot Diane, the daughter of the deceased woman, in the right hand and arm, and the defendant was shot in the throat.

The defendant testified that upon his return about midnight Geraldine was sitting at the kitchen table with the rifle; that she fussed at him about having been with another woman and threatened him; that as she started to get up he tried to take the rifle from her and was shot; that as he lay on the floor, paralyzed, he heard several shots and later saw the two dead persons, the gun lying beside Geraldine on the floor. He denied ever having or firing the gun. Defendant drove himself to the hospital.

Statements attributed to the defendant at the hospital were not admitted.

Upon the convictions the defendant appealed.

*T. W. Bruton, Attorney General, Harrison Lewis, Deputy Attorney General, Eugene A. Smith, Trial Attorney for the State.*
*Kennieth S. Etheridge for defendant appellant.*

PLESS, J. The only witness to the shooting was the daughter of the deceased woman, Mrs. Diane Godwin. Since a number of exceptions are taken to her testimony we have summarized or quoted it rather fully. After testifying that when the defendant and Boots returned from the unsuccessful trip to get some money, Butler was mad, she then testified: "Ed was cussing at mama and calling her names. He called her a bitch and everything else; he said she didn't have guts enough to tell him anything. That is all I remember him saying, just cussing at her and calling her names. At this time I

was in my bedroom which is right next to the kitchen where a light was on at the time and the door was closed partly. My sister, Teresa Elaine, who is five years old, was the only other person in the room with me.

"Q. What next did you hear between these three who were in the kitchen?    A. When Ed finished cussing at mama, he started shooting around the house.

"Objection by the Defendant. Objection overruled.

"To the failure of the Court to sustain the objection of defend- ant to the answer of the above question, the defendant excepts. Exception No. 1.

"Q. What do you mean by around the house? Was it in the kitchen or where?    A. I guess around the kitchen floor.

"Objection by the defendant. Objection sustained.

"Q. Where was he at the time he was shooting? Objection by the Defendant.

"(By Defense Counsel: Objection on the ground she said her door was closed and this is all purely speculation). (By the Court: She may state where he was, if she knows).    A. In the kitchen somewhere.

"To the failure of the Court to sustain the objection of the defendant, the defendant excepts. Exception No. 2.

"I heard a rifle, gun, or whatever was shooting and I am not sure how many shots I heard; it was several shots. After the first shots, I didn't hear anybody say anything. I do not know how many shots exactly were fired. I heard glass crack and I heard Mama tell Ed to stop shooting in the house and stop breaking glass. Ed didn't say anything. Then after about five minutes, I heard several more shots, and I heard Boots say, 'Ed, you shot me.' Ed said 'yes, you s. o. b., I shot you; I am going to shoot the rest.' Then Eddie came through my bedroom door and shot at me. I had gotten out of bed and was going to try to slip out the back and get help, and that is when he came to my bedroom door and shot at me. He shot at me once and I was hit in the right arm and hand. He did not say anything to me before he shot me or after he shot me.

"After he shot me, Ed went in the room where Mama and Boots was, told Mama he was sorry he shot her, he didn't mean to. Mother didn't say anything. He asked the Lord to forgive him for his sins, and then there was another shot. Ed was still in the kitchen at the time there was another shot and Mother and Junior were still in there.

"(The following questions and answers were not put in the narrative form, because the defendant wished to call them to the attention of the Court on appeal).

"Q. Did you see her at the time he shot, if he shot at that time? A. I didn't see him shoot himself, but I heard the shot. Then he fell between the living room and the kitchen.

"Motion by the defendant to strike the Answer. Motion over-ruled.

"To the failure of the Court to sustain the motion to strike, the defendant excepts. Exception No. 3.

"Eddie fell between the living room and the kitchen. The living room is right next to the kitchen, and the top part of his body was in the living room. I did not go near him at that time and I did not hear him say anything further.

"After he shot me, I had fallen on my bed and fell over like he had killed me and just laid there for five or ten minutes until he left. He went out the front door, but I did not see him as he went out the door and after he went out the door. He cranked up Boots' automobile right then and left in it. He left the rifle lying on the kitchen floor."

While the record indicates that the defendant may have made an incriminating statement to Sheriff Lytch shortly after he went to the hospital, it was not offered in evidence apparently because the defendant had not been properly warned of his rights at that time.

The defendant testified in substance that when he and Boots returned about midnight that Geraldine was sitting at the kitchen table with the rifle, that when she started to get up he tried to take the rifle and got shot in the throat. "I sank down * * * and fell over. She (Geraldine) started crying. * * * I was lying on the kitchen floor, face down when I heard the rifle start firing and I heard glass breaking, and I heard Bootsy say, 'You shot me.' He did not say who shot him. When he said that, the door opened to my right, leading to Diane's bedroom. When you close the door, if you don't close it easily, when you open it, it makes a racket. When I walked in the kitchen the door had been closed. When the door opened, Diane called my name, like she was frightened; there was another shot; she screamed and the door slammed. Everything got quiet for two minutes. I was lying on the floor, felt like I was paralyzed and felt like I was going off to sleep. I could feel the floor dent. I could hear footsteps and felt the floor jar, like somebody walking. Two minutes later I heard two more shots; I guess I lay on the floor a couple more minutes; began to get where I could get up; got on my hands and knees and the first thing I saw was Geraldine lying between the table and cabinets, laying on her left side, her eyes still open. Her face was about directly in front of mine as I was lying face down. I looked around to see where Bootsy was. He was sitting

on a chair to my left, had his head thrown back. I got up and went to where Geraldine was and the rifle was laying beside her. I pushed the rifle to one side, laid down beside her, put my arms around her, and her eyes were still open. I said Geraldine, are you dead? She didn't answer and I knew she was dead. I got up and the blood was gushing out of my mouth, nose and throat. I thought I was dying; then I walked over to where Bootsy was. I lay the back of my hand on his chest and I couldn't feel his heart beat. I came out of the kitchen and Robert was sitting on the bed. He asked me, 'Ed, are you all right?' I said, 'No, son, I am shot.' And I walked out of the front door. I saw a car in the yard and it popped in my mind, maybe I can make it to the hospital. I got in the car and drove it to the hospital."

On cross-examination the defendant was asked about statements he allegedly made at the hospital. He said he didn't remember them, and no attempt was made to contradict him.

He was also asked about later statements while in the hospital at Raleigh, to which he replied that he had then told that the gun went off when he was taking it from Mrs. Brown. He denied having said then that Diane had shot him. The Sheriff was not permitted to testify about any statement made by the defendant except one he made about a week after the shooting, when he had been warned of his rights. The Sheriff said the defendant then said that Diane Brown did the shooting.

The State also offered the testimony of J. E. Ivey, a deputy sheriff, in corroboration of Diane Brown. He said that he was the first officer to arrive at the Brown home after the trouble was reported, that Diane met him at the door and "I walked in the living room, saw this pool of blood on the floor just inside the door leading from the kitchen into the living room. I said, 'What in the world happened, Diane?' She said, 'Come in the kitchen.' I saw her mother lying on the floor and the Gibson boy sitting in a chair. I asked Diane what had happened. She said Ed had shot her mother and Bootsy Gibson and had shot her (Diane) in the arm; and then had shot himself."

In the brief for the defendants several contentions of error are made which we will now consider in order:

First, the admission of Diane Godwin's evidence regarding the shooting because she was in the adjoining room and, therefore, could not see what happened.

If, upon an extremely technical, unrealistic and impractical interpretation it could be held that Diane's testimony that Butler did the shooting was not competent because she did not actually see him firing the rifle, it was cured when she testified that, following

the shooting, he "went in the room where Mama and Boots was, told Mama he was sorry he shot her * * * asked the Lord to forgive him for his sins, and then there was another shot." She had already testified that the defendant had told Boots he had shot him and that he was going to shoot the rest. In view of the statements attributed to the defendant by Diane, her evidence regarding the shooting would be competent from the use of her other senses; visual not being an absolute requirement under these conditions. Stansbury, N. C. Evidence, 2d Ed., § 96; *S. v. Bridges,* 266 N.C. 354, 146 S.E. 2d 107.

The defendant also complains that his attorney was not permitted to question him on *voir dire,* in the absence of the jury. The Court was then inquiring into the conditions of a statement the State was seeking to show the defendant made to Sheriff Lytch. It developed that the defendant had made no statement incriminating himself and the Judge refused to admit it. Under these conditions there was nothing to require or justify a friendly "cross-examination" of the defendant by his own attorney. Also the record does not show what could have been elicited to further favor the defendant.

Sheriff Lytch testified that the picture of Gibson's body correctly represented its condition. The fact that the deceased's shirt had been unbuttoned so that the wounds in his chest would appear in the picture did not affect its correctness. He testified that Exhibit 7 was an accurate picture of Geraldine Brown as she lay on the floor after being shot.

This evidence coupled with the Court's admonition that the pictures were to be considered for the sole purpose of illustrating the testimony of the witnesses makes the exception to their admission untenable. Stansbury, N. C. Evidence, 2d Ed. § 34; *S. v. Gardner,* 228 N.C. 567, 46 S.E. 2d 824; *S. v. Rogers,* 233 N.C. 390, 64 S.E. 2d 572.

The defendant also complains about questions asked of him by the Solicitor. These were to the effect that he, the defendant, had told the Sheriff while at the hospital that he had shot the deceased persons. The defendant replied that he had not, and further stated that he did not remember talking with the Sheriff at that time. The State made no effort to contradict him and he has therefore not been prejudiced.

In his brief the defendant makes frequent references to the recent rulings of the U. S. Supreme Court in *Escobedo v. Illinois,* 378 U.S. 478, 12 L. Ed. 2d 977, 84 S. Ct. 1758, and *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d, 694. They cannot avail him. The ruling in *Miranda* was not to be applied retroactively, that is, to cases

tried before 13 June, 1966. Since the trial here was some three months before that date its requirements were not applicable.

Neither can *Escobedo* affect the result here. The U. S. Supreme Court summarized its ruling in that case as follows: "We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' *Gideon v. Wainwright,* 372 U.S., at 342, 9 L. Ed. at 804, 93 A.L.R. 2d 733, and that no statement elicited by the police during the interrogation may be used against him at a criminal trial."

There was no claim made by the defendant that he was denied counsel and the affirmative evidence was that he had been informed of his rights and that he did not have to tell anything at all. It was following that that the defendant further denied his guilt and said "Diane Brown was the one that killed them."

The defendant's rights have been fully protected. No statement admitting any guilt on his part has been attributed to him. In fact, it was only after the State had rested its case and the defendant had voluntarily testified, denying his guilt, and asserting that Geraldine Brown did the shooting, that the statement (that Diane Brown was the one who killed them) was introduced, on rebuttal, by the State.

This was not an admission or confession but was exculpatory, even though a contradiction of his testimony. There is a difference between a defendant's admission of his own guilt and his claim that another is guilty. "Exculpatory statements, denying guilt, cannot be confessions. This ought to be plain enough, if legal terms are to have any meaning and if the spirit of the general principle is to be obeyed. This necessary limitation of the term 'confession' is generally conceded." III Wigmore on Evidence, 240.

Defendant also takes exceptions to *questions* asked by the Solicitor of the defendant, even though the answers denied admissions by the defendant. The presiding Judge cannot be expected to rule out questions before they are asked, and when, as here, he promptly sustained the objections, the defendant has shown no substantial disadvantage.

The defendant complains that after the jury had failed for several hours to render a verdict the Judge urged the jurors to agree

upon a verdict, but this is entirely proper when, as here, he asks that they "reconcile any differences of opinion existing among you if it possibly can be done without a one of you surrendering your conscientious convictions in this matter." The object of having a jury deliberate is so that each one may not only express his opinion, but that he listen to and consider those of his fellow jurors. As long as a juror is not forced into participating in a verdict that violates his conscience there is no good reason why he should not give heed to the opinions of his fellows. The fact that an overwhelming majority has different views from his own should not make him feel that he must join in a verdict that causes him conscientious unhappiness. But the fact that he is one of a very small minority should well cause him to consider that he and not his fellows can possibly be mistaken in his opinion. *S. v. McKissick,* 268 N.C. 411, 153 S.E. 2d 28.

We have considered the entire record and the numerous exceptions of the defendant and are of the opinion that he has had a fair trial, free of substantial error.

No error.