609 P.2d 1046

The STATE of Arizona, Appellee,

v.

Ronald Lee MADSEN, Appellant.

No. 4353.

Supreme Court of Arizona,
In Banc.

March 26, 1980.

John A. LaSota, Jr., Former Atty. Gen., Robert K. Corbin, Atty. Gen. by William J. Schafer III, Diane M. Ramsey, and Ronald R. Crismon, Asst. Attys. Gen., Phoenix, for appellee.

Thinnes & Rawles, by Thomas A. Thinnes, Thomas V. Rawles, Phoenix, and William C. Porter, Kingman, for appellant.

CAMERON, Justice.

This is an appeal by Ronald Lee Madsen from a jury verdict and judgment of guilt to the crime of first degree murder in violation of A.R.S. §§ 13–451, –452, as amended; and § 13–453(A), as amended; and a sentence of death pursuant to A.R.S. § 13–454.[1] We have jurisdiction pursuant to A.R.S. § 13–4031.

We must determine five questions on appeal:

1. Was the search of defendant's trailer violative of the Fourth Amendment to the United States Constitution in that the search warrant did not describe with sufficient particularity the place to be searched?

2. Were certain of the prosecutor's questions cross-examination by innuendo and prejudice?

3. Did the trial court err when, during the defendant's closing argument, he struck from the record previously admitted evidence regarding a polygraph?

4. Was the death sentence appropriate in this case?

5. Did the trial court err in denying defendant's motion for new trial based upon newly discovered medical evidence?

The facts necessary for a determination of this matter on appeal are as follows. Defendant Ron Madsen and his wife Robyn Lesene Madsen were married in September of 1974 and lived and worked near Bullhead City, Arizona. On 20 February 1976, Robyn filed for dissolution of marriage. A reconciliation was attempted but failed, and the parties were still separated in January of 1977.

About one week prior to Robyn's death, defendant, accompanied by his friend Jay Charnell, drove to pick up Robyn for an outing. Jay was dropped off along the road with the agreement that when defendant returned with Robyn, Jay should pretend to be a hitchhiker. When defendant and Robyn drove by later, they picked up Jay who said he was going to Kingman for auto parts. Defendant asked Robyn if she wanted to stop in the desert to target shoot. Robyn declined, and defendant then suggested they get together the next weekend to sight in their rifles for an upcoming javelina hunt. Robyn agreed and asked Jay to come along. He agreed.

On 23 January 1977, Jay, defendant, and Robyn went target shooting in the desert between Bullhead City and Kingman, Arizona. After a period of target shooting, defendant walked off to the right with his .30–06 rifle which had been sighted at

1. Title 13 citations in this opinion are to the Arizona Criminal Code as it existed prior to its extensive revision effective 1 October 1978.

100 feet. Defendant told them he was looking for rabbits to shoot. Jay Charnell was throwing cans for Robyn to shoot. Jay testified he threw a can for Robyn, heard a loud shot, looked at Robyn and found her lying on the ground. She had been struck in the head by a bullet from the left. Jay testified that defendant approached from the left and said, "there, it's done." He also testified that defendant rubbed gravel on his arms so it would look like he had fallen. Defendant later claimed that he had tripped on a clump of grass, falling onto his hands and knees, and the gun had gone off as he fell.

Defendant covered Robyn's head with a blanket, put her in the truck and drove her to the Mohave General Hospital in Kingman, where she died from the gunshot wound. Jay testified that on the drive to Kingman, defendant practiced the story he would tell to explain the accidental shooting. He also practiced crying so he would appear emotionally distraught before the authorities.

Police met them at the hospital and interviewed them regarding the shooting. The stories Jay and defendant told regarding the incident were inconsistent in several regards. After Jay spoke to the police, he wrote defendant a note warning him he had not given the agreed-upon story. The note stated:

> "You shot from the wrong side so I had to change the story. She was facing toward Bullhead. You were in the gully on the left of here. I was to your left. Robyn yelled its time to go and we started walking toward the truck. You slipped and the gun went off."

Jay further testified that several days before the shooting, defendant had made him write and sign a note regarding the shooting. Jay claims to have been so intoxicated at the time of the writing that he did not remember the contents of the note until police showed it to him after Robyn's death. That note said:

> "I Jay A. Charnell, plotted the death of Robyn Madsen with Ron Madsen for the weekend of 1–8–77. /s/ Jay Charnell."

Jay left the state shortly after the incident. He was arrested in Alabama and agreed to testify for the State.

While incarcerated awaiting trial, defendant became friends with a fellow inmate, Dan Ford. Through written notes, defendant offered Mr. Ford an initial $15,000 and $25,000 later if he would murder Jay Charnell and Robert Bennett, another witness. Defendant told Ford that his stepfather would pay him and that they would both go free.

Defendant was convicted of first degree murder, sentenced to death, and appeals.

## SEARCH OF THE TRAILER

Defendant and Mr. Fred Madsen, defendant's stepfather, and Lillie Madsen, defendant's mother, lived in two trailer houses on Hancock Road on adjoining parcels of land. A wire fence encircled both trailers so that there was only one entrance for the two trailers. There was no fence separating the two trailers. Neither trailer had a street address indicated on it, but the elder Madsens' trailer bore a sign, "the Madsen's, Fred and Lillie." Although the lot upon which defendant's trailer was located was Number 698 E. Hancock Road, both he and the elder Madsens referred to the whole compound as 706 E. Hancock. Defendant gave 706 as his address on several occasions during the proceedings, and Jay Charnell gave 706 as defendant's address at the hospital on the day of Robyn's shooting.

After Robyn's death, defendant dated a woman named Sherri Chute. During an argument while he was intoxicated, defendant showed Ms. Chute several notes he had concealed in the hatband of his cowboy hat. These notes incriminated both defendant and Jay Charnell in a conspiracy to murder Robyn. Ms. Chute noted the hiding place in which defendant again placed the notes, and later related the incident and the whereabouts of the notes to a Mr. Robert Bennett. When defendant was away from his trailer, Mr. Bennett and Ms. Chute went to the trailer, located and read the notes. Bennett then secured the notes by taping

them to the inside of one of the closets in the trailer. Bennett then informed a deputy sheriff of the contents and whereabouts of the notes. Pursuant to this information, Officer Dow filed an affidavit seeking authorization to search the premises at "706 E. Hancock Road, Riviera, Arizona." Judge McCune issued the requested warrant for "the premises known as 706 E. Hancock Road, Riviera, Arizona, for a handwritten note indicating Ronald Lee Madsen and Jay Charnell had conspired to kill Robyn Lesene Madsen." The search of defendant's trailer disclosed the notes described in the affidavit and warrant.

At the hearing on defendant's motion to suppress, it became apparent that Officer Dow knew more about the physical description of defendant's trailer than he had included in the affidavit or the warrant.[2] He also testified that although he attempted to locate the premises by comparing the addresses of houses on either side, the primary means by which he located the premises was by the description of the trailer given by Mr. Bennett. Officer Dow searched only defendant's trailer and seized the notes, a hat and life insurance policies, all of which were introduced as evidence at trial.

Defendant claims the trial judge erred in denying his motion to suppress notes seized during a search of his trailer. It is defendant's position that the search warrant did not describe the place to be searched with sufficient particularity and therefore violated his Fourth Amendment right against unreasonable searches and seizures.

■ The Fourth Amendment to the United States Constitution requires that the place to be searched must be described in the warrant with sufficient particularity so that the officer executing the warrant can, with reasonable effort, identify the place to be searched. *Steele v. United States,* 267 U.S. 498, 45 S.Ct. 414, 69 L.Ed. 757 (1925).

"Constitutional requirements relating to searches are satisfied in these cases if the warrant describes the premises to be searched with reasonable certainty, and a technical description is unnecessary. * * *" *People v. Watson,* 26 Ill.2d 203, 186 N.E.2d 326, 327 (1962), cited in *State v. Morgan,* 120 Ariz. 2, 3, 583 P.2d 889, 890 (1978).

We have held in a case where the warrant contained the address 1803 E. Adams, when in fact the address was 1813 E. Adams, that the warrant was sufficient because the rest of the information contained in the warrant correctly described the place to be searched. Viewing the mistake in the address as a minor error under the facts, we stated:

"Notwithstanding the error in the address and the asserted error in color, the warrant described appellant's apartment with reasonable certainty and particularity." *State v. Morgan,* supra, 120 Ariz. at 4, 583 P.2d at 891 (1978).

■ In the instant case, the affidavit and warrant gave the address used by the defendant himself and stated the name of the defendant. This was a rural area. There were only two trailers at the address and Ronald Lee Madsen's trailer could easily be determined. The other trailer contained a sign identifying it as belonging to Fred and Lillie Madsen. An officer without the additional knowledge possessed by Officer Dow should have been able to find the correct trailer with reasonable certainty.

Both the affidavit and warrant described with reasonable certainty and particularity the place to be searched. We find no error.

## PREJUDICIAL CROSS–EXAMINATION BY INNUENDO

The State's theory of this case was that defendant intentionally murdered his wife, Robyn. The prosecutor attempted to prove this theory by showing numerous incidents of marital discord. The prosecutor, on cross-examination of the elder Mr. Madsen, elicited the following testimony:

"Q (BY MR. CRISMON): Mr. Madsen, do you recall any occasions when, because of the difficulties between

---

2. We must comment that we would not have found it necessary to consider this matter on appeal had this additional information been included in the affidavit and the warrant.

Ron and Robyn you found it necessary to call the police department, sheriff's office? Ever recall calling the sheriff's office?

"A (BY MR. MADSEN): Not that I recall, sir.

"Q Do you ever recall an officer Don Gary coming to the house and talking to you?

"A Oh, I remember talking to Don Gary.

"Q How did that come about that he was there?

"A I believe I was standing out front and he drove by and he stopped.

"Q Did he stop and come in?

"A Not in the house.

"Q Did he stop and talk to you?

"A He stopped and talked to me.

"Q Was Robyn there at the time?

"A I don't recall.

"Q Had you placed any calls prior to that time?

"A Not that I recall.

"Q Do you recall at anytime ever seeing any difficulties where you felt it necessary to call anyone else between Ron and Robyn?

"A At what time?

"Q Well, anytime during their marriage?

"A During their marriage?

"Q Yes.

"A Not that I recall."

After Mr. Madsen left the stand, the defense rested and the State indicated they had no rebuttal. Defense counsel then moved for a mistrial on the theory that the quoted cross-examination assumed, by innuendo, that the sheriff's office had been called to quell a family fight between Ron and Robyn. During argument on the motion, the State explained that it had been surprised by the witness's denial and that the State's rebuttal witness, Officer Gary, had returned to Mohave County the night before and was therefore not available to testify further regarding the questions raised by Mr. Madsen's examination. The motion for mistrial was denied and the defendant now claims error because of the prejudicial effect of the State's cross-examination.

In *State v. Holsinger*, 124 Ariz. 18, 601 P.2d 1054 (1979), we disapproved of the practice of asking questions that had no basis in fact and could not be adequately rebutted by testimony or instructions from the court. In that case the prosecutor had asked a witness a question which implied that the defendant "had a long criminal record," when, in fact, the defendant did not. We held that both the question and the facts inferred in *Holsinger*, supra, were improper. In the instant case, the cross-examination by the prosecutor was a good faith attempt to elicit answers which the State had reason to believe would be forthcoming and which would also be admissible. When Mr. Madsen made his denial, the prosecutor did not pursue the matter further and made no attempt to contradict the denials made by Mr. Madsen.

Even though the prosecutor did not have available a witness to corroborate the fact implied by the questions on cross-examination, we do not believe that defendant has been prejudiced. The witness denied the inferences contained in the question and his denials were not challenged in any way. Where denials to questions on cross-examination are uncontradicted by the cross-examiner, the denial itself can serve to cure any error or prejudice. *State v. Butler*, 269 N.C. 483, 153 S.E.2d 70 (1967). See also *Wallace v. State*, 501 S.W.2d 883 (Tex.Cr. App.1973). We find no error.

### STRIKING PREVIOUSLY ADMITTED EVIDENCE

During the second day of trial, Officer Heersema testified about a police interview with defendant shortly after Robyn's shooting. During cross-examination, reference was made to a transcript of that interview which had been previously marked for identification as Exhibit 23. Defense counsel moved for its admission. The exhibit was admitted in its entirety by stipulation.

Later, during cross-examination of witness Sherri Chute, defense counsel asked Ms. Chute to relate a conversation she had with defendant. The State requested permission to approach the bench to object to the broadness of the question and the possible subjects contained within it. The following discussion took place:

"MR. CRISMON: At one point in time, Your Honor, there were discussions wherein he said he had taken a polygraph, which is untrue.

"THE COURT: Had what?

"MR. CRISMON: Had taken a polygraph examination which is untrue, and I have specifically told her not to make comment about them in my direct. I don't know, by such an abrupt question, whether there may be reference to that.

"MR. PORTER: I should point out to the court, in case Mr. Crismon hadn't noticed it, in the written statement that was admitted as Number 23, there are several mentions of the polygraph where the officers asked him point-blank whether he will and he says he will.

"MR. CRISMON: I omitted that, then.

"MR. PORTER: Further, I would point out to Mr. Crismon that the officer never followed through on it; that it was not a matter of his declining to take one."

The court admonished trial counsel and the witness that there was to be no reference to the offer to take a polygraph examination.

There was no mention of polygraph by either counsel until closing argument of defendant when defense counsel discussed the police interview transcribed in Exhibit 23:

"(BY MR. THINNES): Additionally, Mr. Madsen, if you will take the time to read his interview, which is about 45 pages long, was asked by the police officer in that interview, which is in evidence, 'Mr. Madsen, will you take a lie detector—'

"MR. CRISMON: Your Honor, I believe this matter was broached earlier at the bench and we would—

"THE COURT: The objection is sustained. The comment is ordered stricken from the record and the Jury's instructed to disregard it—"

The court struck from the record the portion of Exhibit 23 which referred to the polygraph. Defense counsel then moved for a mistrial because of the prejudice caused by the judge's striking evidence on which defense had already commented in closing. Defendant claims he was prejudiced by the fact that the jury was left hanging on counsel's remark about the polygraph without any explanation as to its meaning. We do not agree.

■ In Arizona, it is error, absent a stipulation between parties, to refer at trial to polygraph examinations for any reason. *State v. Melendez*, 121 Ariz. 1, 588 P.2d 294 (1978); *State v. Marquez*, 113 Ariz. 540, 558 P.2d 692 (1976); *State v. Bowen*, 104 Ariz. 138, 449 P.2d 603, cert. denied 396 U.S. 912, 90 S.Ct. 229, 24 L.Ed.2d 188 (1969). This rule binds both parties. The defendant may not introduce evidence of his willingness to take a polygraph test; and the State may not show defendant's refusal to submit to such a test. *State v. Valdez*, 91 Ariz. 274, 371 P.2d 894 (1962). See *State v. Gandara*, 111 Ariz. 80, 523 P.2d 511 (1974). We have also held that the trial court has discretion to strike testimony which has previously been received into evidence. *James v. Krpan*, 116 Ariz. 216, 568 P.2d 1114 (App.1977); *State ex rel. State Highway Comm. v. Martinez*, 81 N.M. 442, 468 P.2d 413 (1970).

■ Here defendant introduced evidence which included defendant's willingness to take a lie detector test. The judge was within his discretion in sustaining the prosecution's objection and in striking or suppressing the offending portions of Exhibit 23. We find no error.

### THE DEATH PENALTY

The judge found two aggravating factors and no mitigating factors sufficient to call

for leniency and sentenced defendant to death pursuant to A.R.S. § 13–454. Defendant appeals the findings and the sentence.

■ Initially defendant argues that the Arizona death penalty statute is unconstitutional in that it constitutes cruel and unusual punishment. We rejected this claim in *State v. Richmond*, 114 Ariz. 186, 560 P.2d 41 (1976) and *State v. Watson*, 120 Ariz. 441, 586 P.2d 1253 (1978), cert. denied, 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979). We need not reconsider the matter here.

■ In *State v. Richmond*, supra, we held that the gravity of the death penalty required that we "painstakingly examine the record to determine whether" the death penalty has been erroneously imposed. We also must make an independent review of the facts to determine the presence or absence of aggravating and mitigating circumstances. *Richmond*, supra; *State v. Verdugo*, 112 Ariz. 288, 541 P.2d 388 (1975). See also *State v. Evans*, 124 Ariz. 526, 606 P.2d 16 (1980); *State v. Lujan*, 124 Ariz. 365, 604 P.2d 629 (1979); *State v. Blazak*, 114 Ariz. 199, 560 P.2d 54 (1977). In the instant case, the trial court found two aggravating circumstances: (1) that the crime was committed in an especially depraved manner and (2) that the crime was committed in expectation of financial gain.

a. Was the crime committed in an especially depraved manner?

The trial judge found, pursuant to A.R.S. § 13–454(E)(6) that the killing was "committed in an especially depraved manner." This finding was made pursuant to the statute that one of the aggravating factors that the court may consider in imposing the death penalty is whether "the defendant committed the offense in an especially heinous, cruel or depraved manner." A.R.S. § 13–454(E)(6).

In applying this provision of our death penalty statute, we have stated:

> "The words 'heinous, cruel or depraved' have meanings that are clear to a person of average intelligence and understanding. Webster's Third New International Dictionary defines them as follows:
> 'heinous: hatefully or shockingly evil; grossly bad.
> 'cruel: disposed to inflict pain esp. in a wanton, insensate or vindictive manner; sadistic.
> 'depraved: marked by debasement, corruption, perversion or deterioration.'"

*State v. Knapp*, 114 Ariz. 531, 543, 562 P.2d 704, 716 (1977), cert. denied 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978).

In the instant case, the defendant fired one shot from his rifle and hit the victim in the back of the head. Immediately upon impact, the victim lost consciousness which she never regained before her death.

The trial judge appeared to rely on the fact that the defendant planned the killing and lured his wife into a helpless and dangerous position. We agree that the murder was planned and cold-blooded, but the fact that this was a deliberate scheme to murder the victim goes to the premeditation required for first degree murder. We do not find that the killing here was committed in an especially depraved manner. There was no debasement of the victim by the defendant. Defendant's conduct was not perverted. Defendant's acts were not set "apart from the norm of first degree murder." *State v. Brookover*, 124 Ariz. 38, 601 P.2d 1322 (1979); *State v. Watson*, supra. We do not find the murder was committed in an "especially depraved manner." A.R.S. § 13–454(E)(6).

b. Expectation of financial gain.

The statute provides as an aggravating factor that "the defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value." A.R.S. § 13–454(E)(5).

At sentencing, the trial judge found that the murder was committed in expectation of financial gain and that

"expectation of the receipt of the insurance money, was one of the reasons for the killing."

In February 1976, defendant and his wife Robyn became interested in taking out a joint life policy, and Robyn set up an appointment with Dave Northrup, the insurance agent who insured defendant's home and automobile. At a meeting at defendant's home, the couple applied for a joint, whole life, double indemnity insurance policy with a face value of $25,000. The double indemnity provision provided the policy would pay double face value, or a total of $50,000, in case of accidental death. The policy was reciprocal in that in the event of either spouse's death, the surviving spouse would be the beneficiary of the policy proceeds.

After the Madsens took out the policy, they became separated and Robyn filed for divorce proceedings. Defendant kept up the premium payments at this time because, as he testified at trial, he still believed he and Robyn would reconcile.

Although defendant met with Mr. Northrup shortly after Robyn's death regarding insurance for his truck and the Volkswagen Robyn had used, the subject of the life insurance proceeds was not broached until a second meeting two or three weeks after Robyn's death. Defendant met with Northrup at that time to clear up some problems with the automobile insurance. Mr. Northrup testified at trial that it was he, rather than defendant, who brought up the subject of the insurance policy at that meeting, because he felt he should begin processing the claim. After reminding defendant of the policy, Mr. Northrup then informed him of the papers required for collection. Later, not having received these papers, Mr. Northrup wrote to defendant and reminded him again to fill out and return the necessary papers. After these urgings, defendant completed the papers and called several times to check on the progress of the claim. He finally received approximately $50,000 from the insurance company.

The State introduced the statements of defendant to his friend Warren Cook. After Robyn's death, defendant and Cook were at a bar discussing the cost of a new engine defendant had purchased for his hydro-boat. Cook testified that defendant had plenty of money now because he had the insurance money. Cook quoted defendant as saying:

"It's easy to get money, you just blow someone away and collect the insurance on it."

The mere existence of the policy and the receipt of the proceeds does not establish that the killing was done in expectation of the profit from the insurance policy, nor does defendant's after-the-fact statement regarding the collecting of insurance money indicate that he committed the murder for the purpose of receiving the insurance proceeds. A.R.S. § 13–454(E)(5) requires that the murder must have been committed for the consideration of financial gain. To comply with the statute, the receipt of the money must be a cause of the murder, not a result of the murder. We do not believe that there was sufficient evidence from which it could be found that there was financial motivation on defendant's part for the murder. From an independent examination of the record as required by *Richmond*, supra, we do not believe this aggravating circumstance has been shown.

c. Did defendant's mental condition constitute a mitigating circumstance?

Defendant also contends that his mental condition was a mitigating circumstance that outweighed the aggravating circumstances. Since we have decided that, for the purposes of the death penalty, the two aggravating circumstances found by the court did not exist, we must reduce the sentence from death to life imprisonment without possibility of parole for 25 years. For that reason, we need not consider the failure of the court to find as a mitigating circumstance defendant's mental condition.

### MOTION FOR NEW TRIAL

One of the mitigating factors specifically allowed by the statute is that the

defendant's "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirement of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." A.R.S. § 13–454(F)(1).

At the trial, the question of defendant's sanity was not raised, the defense being that it was an accident. After the jury verdict of guilt, the defendant was sent to the Arizona State Hospital for psychiatric evaluation for the purpose of discovering mitigating factors for sentencing. Later, at the hearing on mitigation and aggravation, the defendant called two witnesses, one a psychometrist and the other a psychiatrist, who had conducted extensive examinations of the defendant.

Psychometrist Dr. LaDeane Casey testified that defendant's delusional behavior demonstrated that he suffered from paranoid schizophrenia. She noted that her tests showed definite brain damage as well as dyslexia, learning disabilities, and a long history of seizures. Based on her extensive psychological testing, Dr. Casey testified:

"Q (BY MR. PORTER): Now, Dr. Casey, would a person with the mental and emotional make-up that you're describing, problems that you've described in the Court have difficulty, in your opinion, in differentiating properly between what society at least might define as right and wrong?

"A Definitely.

   *     *     *     *     *     *

"Q All right. Okay. Assuming that Mr. Madsen were able to recognize right from wrong—you indicated he probably could not, but if he were—would his condition be such a form of duress if you want to look at it as such, that he would not be able to adhere to right?

"A I feel that even if he could state what is right and wrong, that he would—that he feels driven to behave in a certain way and that even though he could recognize—or he could repeat what society might say

to him is right and wrong, that he is driven to follow—he would not be able to follow those guidelines even if he could recognize them. That's what I feel, that being able to state what society says is right and wrong does not mean that he understands them. I do not think that Ron's with reality much of the time."

The defendant's second witness, Dr. John Schulte, a psychiatrist, also testified:

"Q (BY MR. PORTER): My specific questions, then are, is it your opinion that at the time of the shooting in this case, January 1977, that the defendant Ronald Madsen was suffering from mental disease, defect or derangement that prevents his being able to determine right from wrong and adhere to the right?

"A That is my opinion."

In rebuttal, the State offered the testimony of psychiatrist John Marchildon from the Arizona State Hospital. Dr. Marchildon testified that not only did he believe defendant was perfectly sane and competent to be sentenced, but that he felt defendant was feigning mental illness. Dr. Marchildon's opinion is somewhat marred by the fact that his examinations totaled only an hour and twenty minutes and by his admission that his diagnosis was restricted to the post-trial period only. Although he noted the evaluations of Drs. Casey and Schulte in the verdict, Judge Hancock found no mitigating circumstances sufficient to call for leniency.

On the basis of these newly discovered medical findings, defendant made a motion for new trial contending that "counsel for the defense, not being a trained psychiatrist, did not recognize the symptoms of the illnesses diagnosed by Drs. Schulte and Casey and accordingly, had failed to adequately explored the possibilities of a sanity defense" at defendant's trial. The motion for new trial pursuant to Rule 24.1, Arizona Rules of Criminal Procedure, 17 A.R.S., was not timely since it was made more than ten

days after the verdict. Rule 24.1(b), supra. It was properly treated as a motion to vacate judgment pursuant to Rule 24.2, Arizona Rules of Criminal Procedure, 17 A.R.S. Rule 24.2 allows the court to vacate a previous judgment under the standards articulated in Rule 32.1, Arizona Rules of Criminal Procedure, 17 A.R.S. Rule 32.1 provides that a defendant may obtain relief on the basis that

"e. Newly-discovered material facts exist, which the court, after considering

　1. The probability that such facts, if introduced would have changed the verdict, finding or sentence;

　2. The diligence which would have been required to discover and produce the evidence at trial;

　3. The promptness with which the petitioner has commenced a proceeding after discovery of such facts

"may require that the conviction or sentence be vacated."

Considering the facts of the case, we do not believe that defendant's attorney showed a lack of diligence in failing to discover the medical facts brought out by defendant's psychiatric examination. Rule 32.1(e)(3), Arizona Rules of Criminal Procedure, 17 A.R.S. Neither did defendant's attorney fail to act promptly when these facts were brought to his attention. Rule 32.1(e)(2), Arizona Rules of Criminal Procedure, 17 A.R.S. We are concerned, then, only with the question of probability that such evidence would have changed the verdict. Rule 32.1(e)(1), Arizona Rules of Criminal Procedure, 17 A.R.S.

Dr. Marchildon was of the opinion that defendant was merely pretending to have mental problems. The evidence at the trial indicated that the defendant did know the difference between right and wrong. The actions of the defendant in planning the murder, his actions after the shooting in rubbing gravel on his arms, and the testimony of Jay Charnell that while driving Robyn to the hospital the defendant had practiced crying so as to look credible to the police indicated a consciousness of guilt; that is that he knew what he did was

wrong. The evidence was such that the trial court did not abuse its discretion in denying the motion for new trial. *State v. Villalobos*, 114 Ariz. 392, 561 P.2d 313 (1977); *State v. Kidwell*, 106 Ariz. 257, 475 P.2d 241 (1970); *State v. Vann*, 11 Ariz. App. 180, 463 P.2d 75 (1970).

We do not find the death penalty appropriate and reverse the trial court's finding and reduce the sentence to life imprisonment without the possibility of parole for 25 years.

Judgment affirmed.

STRUCKMEYER, C. J., HOLOHAN, V. C. J., and HAYS and GORDON, JJ., concur.