815 P.2d 869

**STATE of Arizona, Appellee,**

v.

**Michael Ray WHITE, Appellant.**

**No. CR–88–0287–AP.**

Supreme Court of Arizona,
En Banc.

July 16, 1991.

Robert K. Corbin, Former Atty. Gen. by William J. Schafer III, Former Chief Counsel, and R. Wayne Ford, Asst. Atty. Gen., Phoenix, for appellee.

John C. Williams, Prescott, for appellant.

## OPINION

CAMERON, Justice.

### JURISDICTION

A jury convicted Michael Ray White (defendant) of first degree murder and conspiracy to commit first degree murder. The court sentenced defendant to death for the murder conviction and to life imprisonment without possibility of parole for twenty-five years for conspiracy to commit first degree murder. The court further ordered that if the death sentence were reduced to life imprisonment, the life sentence for conspiracy would be served consecutively to the reduced life sentence imposed on the murder count. Appeal is made to this court under rule 31.2(b), Ariz.R.Crim.P., 17 A.R.S. We have jurisdiction pursuant to Ariz.Const. art. 6, § 5(3), and A.R.S. §§ 13–4031, –4033, and –4035.

### ISSUES

We must determine fourteen issues on appeal:

1. Did the trial court err in refusing to give a jury instruction concerning the jury's role in determining the admissibility of a co-conspirator's statements?

2. Did the trial court's refusal to instruct the jury that it must disregard a co-conspirator's statements that fell outside the scope of the conspiracy found by the jury deny the defendant his right to a trial by jury?

3. Did the trial court's refusal to instruct the jury on its role in determining the admissibility of hearsay statements

deprive the defendant of his constitutional right of confrontation?

4. Did the trial court err in admitting hearsay statements made:

(a) By a co-conspirator after the shooting, which defendant claims were neither "in furtherance of" nor "in the course of" the conspiracy?

(b) By the defendant relating to the co-conspirator's efforts to enlist defendant in the plan to kill the victim?

5. Did the trial court err in admitting testimony that defendant was a bigamist and further err in denying his motion for a mistrial?

6. Is the defendant entitled to a new trial because of the cumulative effect of the evidentiary errors?

7. Does "conviction of conspiracy to murder and aiding and abetting murder constitute double jeopardy?"

8. Was due process denied when this court refused to order a mental examination after a *prima facie* showing of incompetency to assist in the appeal?

9. Did the death qualification *voir dire* of the jury improperly prejudice the jury and deprive the defendant of his right to an impartial jury in violation of the sixth and fourteenth amendments to the United States Constitution and article 2, §§ 1, 4, 23, and 24 of the Arizona Constitution?

10. Was the imposition of the death penalty inappropriate in this case when the only aggravating factor found by the trial court was that the murder was committed in expectation of pecuniary gain?

11. Was equal protection denied because a female co-defendant received life imprisonment for the same crime?

12. Was appellant denied the right to present mitigation evidence to this court?

13. Is Arizona's capital punishment statute constitutional under the various arguments presented herein?

14. Was the death sentence under the circumstances of this case excessive and/or disproportionate to the crime?

## FACTS AND PROCEDURAL BACKGROUND

At approximately 11:00 p.m. on 12 December 1987, neighbors of David and Susan Johnson (David and Susan) heard gunshots at the Johnson residence in Bagdad, Arizona. Neighbors saw a man run from the residence and enter a green car, which sped away. Shortly thereafter, a bleeding David walked to a neighbor's home, where he collapsed. He had been shot in the chin and in the back with a .357 magnum revolver. Before he died, David told various persons that a man wearing a mask shot him. Susan told police and other witnesses that her ex-husband, Clifford Minter, shot David. Susan allegedly obtained this information from David before he died and was apparently the only person to hear David make this identification. To others, David simply said that a man with a mask shot him. The description of the green car and the name, Clifford Minter, were broadcast over the police radio.

An officer on his way to the shooting scene spotted the green vehicle driving out of Bagdad and stopped it. Defendant was the sole occupant. Defendant explained that he had just dropped off a companion and was on his way home. Because the police broadcast named Clifford Minter as the suspect, the officer released defendant.

Police soon discovered that Minter was not involved in the shooting and began focusing their investigation on defendant and Susan. They learned that defendant met Susan in January 1987, when the two worked at a nursing home in Prescott, Arizona. In April 1987, the couple went to Michigan and worked together in a nursing home. Susan returned to Prescott in October 1987 to marry David. Defendant returned shortly thereafter and, despite Susan's engagement and subsequent marriage to David, resumed intimate relations with her. Defendant later told several persons that Susan asked him to kill David.

The investigation revealed Susan's efforts to obtain additional life insurance on David naming her as the beneficiary, and her efforts to change David's life insurance records to make her the beneficiary of his

employer-sponsored life insurance policy. Further investigation revealed that defendant assured his ex-wife, Becky Fisher, that he would pay past due child support obligations because he was coming into some money soon. Defendant said that he would be receiving $100,000. Defendant also mentioned that Susan was divorcing David and that the settlement money she received would be used to put defendant through medical school.

The police also learned that defendant made a down-payment on a revolver at a Prescott pawn shop on 19 November 1987. Defendant later made another payment and picked up the revolver. After David was shot, defendant sold the revolver to a Phoenix pawn shop. The gun was recovered and determined to be the weapon used to kill David. Defendant's car was identified as the green, dented Oldsmobile driven from the murder scene.

Defendant was arrested in Phoenix on 19 December 1987. Police searched defendant's car and found a box of .38 caliber bullets, a ski mask, and a bag of potatoes. Defendant had apparently forced a potato over the barrel of the revolver to act as a silencer. Pieces of dried potato were found at the scene of the shooting and potato starch was found on the barrel of the revolver.

Defendant and Susan were charged with one count of conspiracy to commit first degree murder and one count of first degree murder. Defendant's trial was severed from Susan's.

Defendant claimed at trial that Susan killed David. He said that he went to the Johnson home on 12 December 1987 while David was at work. After having sexual intercourse with Susan, he fell asleep. He was awakened by a noise and went outside, where he saw Susan with the gun. He claimed he told her, "don't do it," and pushed her arms. The gun went off, wounding David. Defendant tried to help David up and told Susan to call an ambulance. He then watched as Susan shot David twice more. Defendant then took the gun and fled.

The jury convicted defendant on both counts. At a presentence hearing, the state argued that the purpose of the murder was to collect the insurance proceeds on the victim's life. Defense counsel presented no mitigation evidence, but argued that defendant's lack of a prior record was a mitigating circumstance. Counsel argued that the evidence did not establish that defendant's involvement in the killing was for financial gain. Rather, defendant acted out of love or infatuation for Susan. Finally, counsel argued for concurrent rather than consecutive sentences.

The trial court found that defendant committed the murder as consideration for the receipt of something of pecuniary value—the insurance money due from the policies on David's life. The court considered as mitigating circumstances defendant's lack of a prior criminal record, his family history (natural father leaving home, alcoholic stepfather), his dependent personality, his inability to form and maintain close relationships, his employment record, his lack of a record of abusive or violent behavior, and his expression of sorrow for David's death. The court found that defendant killed and intended to kill David.

The court sentenced defendant to life imprisonment without possibility of parole for twenty-five years for conspiracy to commit first degree murder. Finding the mitigating circumstances insufficient to warrant leniency, the court sentenced defendant to death for first degree murder. Defendant now appeals his convictions and sentences.

## JURY INSTRUCTIONS

■ Because of the similarity of issues 1–3, we have joined them for discussion. Defendant contends that the trial court erred in refusing to give an instruction on the jury's role in determining the admissibility of co-conspirators' out-of-court statements. Defendant's requested jury instruction, taken verbatim from the California Jury Instructions–Criminal, 6.24 (4th ed. 19___), provides that:

Any evidence of a statement made by one alleged conspirator other than at his

trial shall not be considered by you as against another alleged conspirator unless you shall first determine from other independent evidence that at the time the statement was made a conspiracy to commit a crime existed and unless you shall further determine that the statement was made while the person making the statement was participating in the conspiracy and before or during the time the person against whom it was offered was participating in the conspiracy and, finally, that such statement was made in furtherance of the objective of the conspiracy.

Simply stated, defendant argues that the jury cannot consider a co-conspirator's statements in his trial unless the jury is satisfied that four elements are met. First, the jury must determine from independent evidence that a conspiracy existed. Second, the statement must have been made while the co-conspirator was participating in the conspiracy. Third, the statement must have been made before or during the time defendant participated in the conspiracy. Finally, the statement must have furthered the conspiracy.

Defendant agrees that the trial judge makes a *prima facie* determination of whether a conspiracy exists and whether the statement was in furtherance of the conspiracy, before the evidence may be presented to the jury. Rule 104(a), Ariz. R.Evid.; *Bourjaily v. United States,* 483 U.S. 171, 173–174, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144, 151–152 (1987) ("existence of a conspiracy and petitioner's involvement in it are preliminary questions of fact that, under rule 104, must be resolved by the trial court"). But, defendant adds, the jury is the "ultimate" factfinder and may take a different view of the evidence than the "preliminary" finding made by the trial judge. We do not agree.

Rule 104(a) provides that "preliminary questions concerning the ... admissibility of evidence shall be determined by the court." Rule 801(d)(2)(E) provides that a statement is not hearsay if it is offered against a party and a co-conspirator of the party made the statement "during the course and in furtherance of the conspir-

acy." It is generally accepted in determining the admissibility of statements of a co-conspirator under rule 801(d)(2)(E) that the jury has no input as to admissibility. *State v. Lycett,* 133 Ariz. 185, 194, 650 P.2d 487, 496 (Ct.App.1982); *United States v. Chindawongse,* 771 F.2d 840, 845 n. 4 (4th Cir. 1985), *cert. denied,* 474 U.S. 1085, 106 S.Ct. 859, 88 L.Ed.2d 898, *cert. denied, Siripan v. United States,* 474 U.S. 1086, 106 S.Ct. 863, 88 L.Ed.2d 901 (1986); *United States v. Fleishman,* 684 F.2d 1329, 1337–38 (9th Cir.), *cert. denied,* 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982); 23 C.J.S. *Criminal Law* § 978 (1989). Allowing the jury to determine admissibility could result in great prejudice to defendant. *See, e.g.,* 1 *Weinstein's Evidence* § 104[05](2) (1975):

> To ask the jurors to consider highly prejudicial statements of co-conspirators only if they first find the existence of the conspiracy and the defendant's participation in it, is to present the jury with too difficult a task. In cases where the conspiracy is charged, it creates the absurdity of asking the jury in effect to decide the issue of guilt before it may consider evidence which is probative of guilt.

Jurors do not rule on admissibility—that is the sole province of the trial court. Once the judge determines admissibility the question becomes one of instruction. As such, the jury determines only the weight and credibility of the co-conspirator's statements. *United States v. Whitley,* 670 F.2d 617, 621 (5th Cir.1982). What appellant asks for is an instruction permitting juror evaluation of the admissibility of evidence. The trial court correctly refused this instruction.

■ Moreover, we reject defendant's argument that he was denied his right to a jury trial on this issue. The trial court correctly refused to instruct the jury that it must disregard a co-conspirator's statements that fell outside the scope of the conspiracy. In effect, the defendant argues that the jury ultimately determines not only the existence and scope of a conspiracy, but also the admissibility of evi-

dence within the scope of the conspiracy. We do not agree. Because the admissibility of a co-conspirator's statements is a legal question to be decided by the judge, defendant has no right to a jury trial on this issue.

■ We also reject defendant's argument that he was denied his constitutional right of confrontation because the trial judge refused to instruct the jury on its role in determining the admissibility of co-conspirator's hearsay statements. The trial judge evaluated co-conspirator's statements and admitted the statements as nonhearsay or exceptions to the hearsay rule. We have determined that this evidence was properly admitted. *See infra.* Because the question of admissibility is reserved to the trial judge, defendant was not denied his right of confrontation.[1]

## HEARSAY

Defendant argues that the trial court erred in admitting a vast number of hearsay statements over defendant's continuing objections. For example:

Q. What did Susan Johnson tell you on the 13th, at Mark Sipes' residence, about who shot David Johnson? Not what you asked her, but merely what she said.

A. She said she asked David who did this to him, and he said that Clifford did it.

And she said, "are you sure?" And he said, "yes."

Under rule 801(d)(2)(E) of the Arizona Rules of Evidence, statements of a co-conspirator in the course of or in furtherance of a conspiracy are not hearsay. Defendant contends that the statements were made neither in furtherance of nor in the course of the conspiracy. Rather, defendant argues that these statements were merely an attempt to avoid detection and, therefore, the conspiracy ended with David's death. *See State v. Yslas,* 139

Ariz. 60, 676 P.2d 1118 (1984). We do not agree.

■ We have previously stated that a co-conspirator's statements are admissible "when it has been shown that a conspiracy exists and the defendant and the declarant are parties to the conspiracy." *State v. Baumann,* 125 Ariz. 404, 411, 610 P.2d 38, 45 (1980). Moreover, a conspiracy need not be charged "as long as the record reveals sufficient reliable evidence of a conspiracy to support the admission of the statements of the co-conspirator." *Id.* At the sentencing hearing, the trial court found that defendant was guilty of conspiracy to commit first degree murder. We believe that evidence of a conspiracy was sufficiently reliable to support admission of Susan's statements.

■ In addition, we believe that Susan's statements were made in the course and in furtherance of the conspiracy. Her actions in diverting attention away from herself and defendant to Clifford Minter were not mere acts of covering up nor attempts to conceal the crime after its commission. *Yslas,* 139 Ariz. 60, 63, 676 P.2d 1118, 1121 (a conspiracy does not continue merely because there is concerted action to avoid detection). The object of this conspiracy was not simply to kill David Johnson, but to collect insurance proceeds. Any link between defendant, Susan, and David's death would have precluded collection on the insurance policy. We previously addressed this issue in *State v. Cruz,* 137 Ariz. 541, 672 P.2d 470 (1983). We there stated that:

In some cases ... the object of a conspiracy includes more than the commission of a substantive offense. In such cases the conspiracy may continue after the commission of the substantive offense. For example, where conspiracy embraces payment as its last term, it is "too easy to argue that the conspiracy was at an

---

1. Because defendant has not claimed that admission of the hearsay statements violated his constitutional right to confront witnesses against him, we do not address that issue. We note, however, that "[w]hile the confrontation clause guarantees a defendant the right to con-

front witnesses against him ... the admission of hearsay does not necessarily violate the sixth amendment right to confrontation." *State v. Speerschneider,* 25 Ariz.App. 340, 343, 543 P.2d 461, 464 (1975) (citing *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970)).

end when the object of the conspiracy was realized."

*Id.* at 547, 672 P.2d at 476 (citations omitted). We hold that the object of the conspiracy in this case was more than the killing of David Johnson. Because the conspiracy embraced payment of insurance proceeds as its final term, the conspiracy continued beyond the death of the victim. Therefore, Susan's statements were made in the course of the conspiracy and were properly admitted.

We have reviewed defendant's other claims of error on hearsay grounds and find them either nonhearsay, Ariz.R.Evid. 801(d)(2)(A), cumulative evidence, or harmless error, *State v. Lundstrom*, 161 Ariz. 141, 150, 776 P.2d 1067 (1989) (error harmless when it can be said beyond a reasonable doubt that the error did not affect the verdict).

## PRIOR BAD ACTS

 Defendant's ex-wife, Becky Fisher, testified:

Q. Do you know Michael White?

A. Yes, I do.

Q. Were you married at one time to Michael White?

A. We were married, but after—

MR. LOCKWOOD: Objection, Your Honor, objection.

She's responded to the question. I don't want her to get into other things.

THE COURT: All right. Sustained. Ask another question.

Q. When were you married to Mr. White?

A. December 20th, 1986.

\* \* \* \* \* \*

Q. Are you now divorced from Michael White?

A. Yes.

Q. Did you find out, after your divorce, anything about the validity of that marriage?

MR. LOCKWOOD: Objection, Your honor.

THE COURT: Grounds.

MR. LOCKWOOD: Relevancy, and whether she can draw a legal conclusion.

THE COURT: Objection is overruled.

Answer yes or no.

THE WITNESS: Yes.

Q. You went through a legal ceremony?

A. Yes.

Q. And why was it not legal?

MR. LOCKWOOD: Objection, Your honor. Asking her to draw a legal conclusion.

THE COURT: Overruled. You may answer.

THE WITNESS: He had another wife.

Defendant contends that the trial court erred in allowing testimony that he was a bigamist and further erred in failing to grant a mistrial on that point. Defendant argues that the evidence does not qualify under any of the rule 404(b) exceptions of the Arizona Rules of Evidence. Rule 404(b) provides:

Evidence of other crimes, wrongs or acts is not admissable to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissable for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

Evidence of a defendant's prior bad acts are "inadmissible because of the prejudicial effect and lack of probative value concerning the crime with which defendant is charged." *State v. Johnson*, 116 Ariz. 399, 400, 569 P.2d 829, 830 (1977) (citations omitted). We believe defendant's previous bigamy is irrelevant to the crime with which he is now charged. The prejudicial effect of the admitted testimony outweighs its probative value because it simply adds fuel to the jury's conviction that defendant is a "bad man." We have previously excluded this type of evidence because of the danger that the jury, considering the defendant a "bad man," may "convict on lesser evidence than might ordinarily be necessary to support a conviction." *Id.* (citing *State v. Johnson*, 94 Ariz. 303, 306, 383 P.2d 862, 863–64 (1963)). It was error to admit such testimony.

This does not mean, however, that the error was reversible. Such error, even if fundamental, is not reversible under the harmless error doctrine of *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), and *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). As we have noted:

> This Court has held many times that in order to justify a reversal an error must be prejudicial under the facts of the case. The test is whether there was reasonable probability under such facts that a verdict might have been different had the error not been committed.

*State v. Brady*, 105 Ariz. 190, 196, 461 P.2d 488, 494 (1969) (citations omitted).

> Whether denominated harmless error, as when dealing with constitutional error, *Chapman, supra,* or prejudicial error, A.R.S. § 13-3987, as when dealing with non-constitutional error, the test is the same. If it can be said that the error, beyond a reasonable doubt, had no influence on the verdict of the jury, then we will not reverse. The question is not whether, absent the error, there were sufficient facts from which the jury could find the defendant guilty, the question is whether, without this evidence, the appellate court can say, beyond a reasonable doubt, that the jury would have found the defendant guilty.

*State v. Thomas*, 133 Ariz. 533, 538, 652 P.2d 1380, 1385 (1982) (citations omitted). Considering all the testimony—defendant's statements to others about his participation in the murder, his purchase and sale of the murder weapon, human blood on his shirt and glove, and defendant's car at the scene of the murder—we conclude beyond a reasonable doubt that the result would have been the same if the error had not been committed. Therefore, the error in admitting the prior bad acts testimony was harmless.

## CUMULATIVE EFFECT OF ERRORS

Defendant raises the cumulative error doctrine. We have stated:

> Defendant's final evidentiary argument is that the court made a series of erroneous rulings, which, taken together, constitute "cumulative error." We have never recognized a "cumulative error" theory and decline to do so now. Instead, we evaluate each of defendant's claimed errors and determine if it, independently, requires reversal. *See State v. Fleming*, 117 Ariz. 122, 128, 571 P.2d 268, 274 (1977) (*cited with approval in State v. Johnson*, 122 Ariz. 260, 274, 594 P.2d 514, 528 (1979)).

*State v. Prince*, 160 Ariz. 268, 274, 772 P.2d 1121, 1127 (1989). To the extent that defendant is arguing for application of the cumulative error doctrine, that argument has been expressly rejected. We find no error.

## DOUBLE PUNISHMENT

The court instructed the jury as to the element of first degree murder and conspiracy to commit murder, and provided forms of verdict for the two crimes. The court also gave an instruction on aiding and abetting and accomplice liability. The defendant now contends that:

> Because the definitions of aiding and abetting in the commission of a murder and conspiracy to murder overlap, it is impossible to be a conspirator without being an aider—provided that the underlying crime is eventually committed. Therefore defendant is being punished twice for the same acts which comprise the aiding and the conspiring.

The double jeopardy doctrine protects against the twin evils of repeated prosecution for the same offense and multiple punishments. *McLaughlin v. Fahringer*, 150 Ariz. 274, 277, 723 P.2d 92, 95 (1986); *State v. Adamson*, 140 Ariz. 198, 200, 680 P.2d 1259, 1261 (Ct.App.1984). Our double punishment statute further provides that:

> An act or omission which is made punishable in different ways by different sections of the laws may be punished under both, but in no event may sentences be other than concurrent. An acquittal or conviction and sentence under either one bars a prosecution for the same act or omission under any other, to

the extent the constitution of the United States or of this state require.

A.R.S. § 13–116.

The statute and cited case law do not apply. There is only a problem if the defendant is punished twice for the same offense. Because we have upheld the death penalty in this case, that is defendant's sole punishment. If we had reduced the punishment from death to life, we might have had a problem of two statutes, conspiracy and aiding and abetting, being used to punish one crime twice. That is not the case here and we need not answer the question.

## INCOMPETENCY TO ASSIST APPEAL

▆▆▆ Defendant argues that he was denied due process of law because this court refused to order a mental examination after a *prima facie* showing of incompetency to assist in the appeal. Defendant concedes, however, that a "criminal appeal should proceed even if appellant is incompetent to assist counsel." Defendant appears to raise the issue only to establish the groundwork for possible post-conviction relief.

The Michigan Court of Appeals addressed this issue in *People v. Newton,* 152 Mich.App. 630, 394 N.W.2d 463 (Ct.App. 1986), *vacated on other grounds,* 428 Mich. 855, 399 N.W.2d 28 (1987). The Michigan court concluded that, although the issue was novel, it would be unwise to require that defendant be competent to assist counsel in preparing his appeal. *Id.* at 635–636, 394 N.W.2d at 466. The court reasoned that the only remedy it could fashion would be to suspend defendant's appeal until he regained his competency. *Id.* Because this would work to defendant's detriment, the court held that an appeal should "proceed regardless of a defendant's competency." *Id.* We agree. Suspending the appeal would preclude this court from considering even the most clearly reversible or prejudicial error until the defendant regained competency.

Moreover, we note the American Bar Association's position, as expressed in the *ABA Criminal Justice Mental Health*

*Standards* (1989). *Standard* 7–5.4(c) provides that:

Mental incompetence of the defendant *during the time of appeal* shall be considered adequate cause, upon a showing of prejudice, to permit the defendant to voice, *in a later appeal or action for postconviction relief,* any matter not raised on the initial appeal because of the defendant's incompetence.

(Emphasis added). The *Standard* contemplates that an appeal proceed despite a defendant's incompetence to assist the appeal. "[C]onvicted defendants, like parties to appellate litigation in general, do not participate in appeal proceedings." *Id., Commentary Introduction.* Therefore, "mental incompetence rarely affects the fairness or accuracy of decisions." *Id.* Defendant was not denied due process of law.

## DEATH QUALIFICATION VOIR DIRE

▆▆▆ Defendant next argues that he was denied his right to an impartial jury because the jurors were "death qualified" during *voir dire.* He argues that the practice is illegal and unnecessary because the court decides punishment in Arizona. We do not agree.

We have held that "jury questioning regarding capital punishment is permissible where the questioning determines bias of a nature which would prevent a juror from performing his duty." *State v. Martinez-Villareal,* 145 Ariz. 441, 449, 702 P.2d 670, 678 (1985) (citations omitted), *cert. denied,* 474 U.S. 975, 106 S.Ct. 339, 88 L.Ed.2d 324 (1985). In Arizona death penalty cases, the jury determines guilt or innocence, while the death sentence is solely the trial judge's responsibility. *Id.* The focus of the capital punishment *voir dire* is on the juror's ability to impartially determine guilt or innocence "in accordance with the court's instructions and the juror's oath." *Id.* Only when the juror's views about capital punishment "would prevent or substantially impair performance of the juror's duties" will there be error. *Id.* citing *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581, 589 (1980). Be-

cause no juror was so disqualified, we find no error.

## APPROPRIATENESS OF THE DEATH PENALTY

■ Defendant argues that the death penalty is inappropriate in this case because the only aggravating factor the trial court found was that the murder was committed in expectation of pecuniary gain. A.R.S. § 13–703(E) provides that the trial court shall consider the aggravating and mitigating circumstances attendant to the crime of murder before sentencing a defendant to death. This statute further provides that, "if the court finds *one or more* ... aggravating circumstance[s]" and "no mitigating circumstances sufficiently substantial to call for leniency," the court "shall impose a sentence of death." *Id.* (emphasis added). A.R.S. § 13–703(F) lists ten separate aggravating circumstances to consider when imposing the death sentence. One aggravating circumstance is that "the defendant committed the offense as consideration for the receipt, or in expectation of the receipt of anything of pecuniary value." *Id.*

A.R.S. § 13–703(E) specifically provides for the death sentence upon the finding of *one aggravating circumstance. See also State v. Hensley,* 142 Ariz. 598, 691 P.2d 689 (1984). As we noted in *State v. Carriger,* "when an individual is murdered for the pecuniary gain of the assailant, we think the legislature can properly punish this more severely than other first degree murders, and we abide by their decision." 143 Ariz. 142, 161, 692 P.2d 991, 1010 (1984) (citing *State v. Bly,* 127 Ariz. 370, 373, 621 P.2d 279, 282 (1980), *cert. denied, Carriger v. Arizona,* 471 U.S. 1111, 105 S.Ct. 2347, 85 L.Ed.2d 864 (1985)). Because the trial court found that the murder was committed for pecuniary gain, the defendant was properly eligible for the death sentence.

■ This court independently reviews the facts that establish the presence or absence of aggravating and mitigating circumstances. *State v. Richmond,* 136 Ariz. 312, 320, 666 P.2d 57, 65, *cert. denied,* 464 U.S. 986, 104 S.Ct. 435, 78 L.Ed.2d 367 (1983). The only real questions, therefore, are whether the murder was committed in expectation of pecuniary gain and whether no mitigating circumstances were sufficiently substantial to call for leniency.

a. Expectation of Pecuniary Gain.

■ The trial court found that the murder was committed in the expectation of pecuniary gain.

"To form the basis for [the] aggravating circumstance [of pecuniary gain], the hope of pecuniary gain must be the impetus for the murder, not merely its result." *State v. Smith,* 146 Ariz. 491, 503, 707 P.2d 289, 301 (1985) (citing *State v. Harding,* 137 Ariz. 278, 670 P.2d 383 (1983) (Gordon, V.C.J., specially concurring)), *cert. denied,* 465 U.S. 1013, 104 S.Ct. 1017, 79 L.Ed.2d 246 (1984). The state must prove aggravating circumstances beyond a reasonable doubt. *State v. Robinson,* 165 Ariz. 51, 59, 796 P.2d 853, 861 (1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1025, 112 L.Ed.2d 1107, and *cert. denied, Washington v. Arizona,* —— U.S. ——, 111 S.Ct. 1091, 112 L.Ed.2d 1195 (1991).

Defendant argues that the evidence did not establish that his involvement in the killing was for financial gain. Instead, defendant argues that "ample evidence" exists that Susan wanted David killed so that *she* could collect the insurance money, but that his motives are less clear. Defendant contends that he was a willing dupe of Susan, overcome by his infatutation and love for her and his desire to make a life with her.

Defendant argues that this case is remarkably similar to *State v. Madsen,* 125 Ariz. 346, 609 P.2d 1046, *cert. denied,* 449 U.S. 873, 101 S.Ct. 213, 66 L.Ed.2d 93 (1980). In *Madsen,* defendant (Madsen) plotted to kill his wife and did so. After the killing, Madsen received $50,000 from the insurance company. He later said, "It's easy to get money, you just blow someone away and collect the insurance on it." This court held that there was "not ... sufficient evidence from which it could

be found that there was financial motivation on defendant's part for the murder." *Id.* at 353, 609 P.2d at 1053.

This case is distinguishable from *Madsen*. In *Madsen*, defendant and his wife took out a joint life insurance policy in February, 1976. That same month, Mrs. Madsen filed for divorce. Defendant maintained his premiums, however, because he believed that he and his wife would reconcile. In fact, defendant's attempt at reconciliation failed and the Madsens were still separated in January, 1977. Almost one year after taking out the insurance policy, Madsen killed his wife. Madsen made no immediate attempt to collect his insurance proceeds. Rather, his insurance agent prompted him to file the claim. Moreover, the agent had to write and remind Madsen to fill out the necessary papers. It was only after receiving the insurance proceeds that Madsen made his brash statement. We held that:

> The mere existence of the policy and the receipt of the proceeds does not establish that the killing was done in expectation of the profit from the insurance policy, nor does defendant's *after-the-fact* statement regarding the collecting of insurance money indicate that he committed the murder for the purpose of receiving the insurance proceeds.

*Id.* (emphasis added).

In this case, ample evidence indicates that defendant killed David to share in the insurance proceeds. Defendant made his inculpatory statements before killing David. He told his ex-wife, Becky Fisher, that Susan asked him to help her kill David. He also told Fisher that she did not have to worry about child support because he would be getting $100,000. Defendant also made inculpatory statements to other witnesses. He told Carol Sexton that David had taken out a life insurance policy for $100,000. He told Jody Stalf that as soon as his girlfriend (Susan) was divorced (from David), he and Susan were going to use David's money to start a business. Defendant asked Becky if he could stay at her house on December 15 and 16 because he needed an alibi. In addition, on the day of David's funeral, Susan received a call from "Randy" at Ann Wilson's house. Julie Wilson heard Susan ask "Randy" if she should do the paperwork about the insurance. Telephone records, testimony from Susan's brother Randy, and evidence that defendant had previously used Randy's name when contacting Susan, indicate that "Randy" was the defendant. This evidence shows that neither love nor infatuation was defendant's primary motive to kill David. Unlike *Madsen*, the defendant here was motivated by the prospect of financial gain, and this gain was the "impetus for the murder, not merely its result." *Smith*, 146 Ariz. at 503, 707 P.2d at 301.

Imposing the death penalty in this case is not inappropriate merely because the trial judge found pecuniary gain as the sole aggravating factor in the killing. In *State v. Hensley*, this court affirmed the defendant's death sentence when the trial judge found pecuniary gain as the sole aggravating factor and the mitigating circumstances were insufficient to warrant leniency. 142 Ariz. 598, 691 P.2d 689 (1984). We held that the "death penalty is reserved for the cases where the manner in which the crime as committed raises it above the norm of first degree murders." *Id.* at 603, 691 P.2d at 694 (citing *State v. Blazak*, 131 Ariz. 598, 643 P.2d 694, *cert. denied*, 459 U.S. 882, 103 S.Ct. 184, 74 L.Ed.2d 149 (1982)). Killing for pecuniary gain is above the norm of first degree murders. *See State v. Harding*, 137 Ariz. 278, 296–97, 670 P.2d 383, 394–95 (1983) (Gordon, V.C.J., specially concurring), *cert. denied*, 465 U.S. 1013, 104 S.Ct. 1017, 79 L.Ed.2d 246 (1984). In *Harding*, then Vice Chief Justice Gordon noted that a beneficiary who kills an insured to gain life insurance proceeds satisfies the aggravating circumstance of pecuniary gain and, hence, is above the norm of first degree murders. *Id.* We believe this same rationale applies to a non-beneficiary who kills expecting to share in the proceeds of the insured victim. *See also Hensley*, 142 Ariz. 598, 691 P.2d 689.

b. Mitigating Circumstances.

When a defendant is being sentenced for first degree murder, the sentencing court must consider, in addition to the mitigating circumstances of A.R.S. § 13–703(G), any aspect of the defendant's character or record and any circumstance of the offense relevant to determining whether a sentence less than death might be appropriate.

*State v. McCall,* 139 Ariz. 147, 162, 677 P.2d 920, 935 (1983), *cert. denied,* 467 U.S. 1220, 104 S.Ct. 2670, 81 L.Ed.2d 375 (1984). We independently review the balancing of aggravating and mitigating circumstances. *State v. Summerlin,* 138 Ariz. 426, 435–36, 675 P.2d 686, 695–96 (1983). Defendant must prove the existence of mitigating circumstances by a preponderance of the evidence. *State v. McMurtrey,* 143 Ariz. 71, 73, 691 P.2d 1099, 1101 (1984).

Defendant offered only his lack of a prior felony record as a mitigating circumstance warranting the reduction of his death sentence to life imprisonment. In addition, the trial court considered the following facts in mitigation: (1) defendant's natural father left home when defendant was 18 months old and defendant's first stepfather was an alcoholic; (2) defendant has dependent personality traits and admits to past heroin, cocaine and amphetamine use and addiction; (3) defendant appears to be unable to form and maintain close relationships; (4) defendant appears to be unable to take responsibility well, but has done well in his nursing home employment; (5) defendant has been a productive person during various periods of his life; (6) defendant has no prior record of abuse or violent behavior; and (7) defendant expresses sorrow for David's death.

After weighing the mitigating factors against the aggravating circumstance of pecuniary gain, and reviewing the circumstances of the offense, the trial judge found that the mitigating circumstances were insufficient to warrant leniency. We agree.

No factor of A.R.S. § 13–703(G) applies to defendant here. There is no evidence that defendant's capacity to appreciate the wrongfulness of his conduct was impaired or that his capacity to conform his conduct to the requirements of law was significantly impaired. A.R.S. § 13–703(G)(1). Neither is there evidence that defendant was under unusual and substantial duress or that defendant's participation in the crime was minor. A.R.S. § 13–703(G)(2), and (3). Moreover, defendant is 36 years old, knew that his conduct would cause death, and intended to kill David Johnson. A.R.S. § 13–703(G)(4) and (5). Despite the absence of statutory mitigating circumstances, however, we must still consider other possible mitigating factors to determine whether the death sentence is appropriate. *McCall,* 139 Ariz. at 162, 677 P.2d at 935.

Defendant claims his lack of a prior criminal record is a mitigating circumstance. We agree. By itself, however, this mitigating circumstance, is not sufficient to warrant leniency. *State v. Clark,* 126 Ariz. 428, 616 P.2d 888, *cert. denied,* 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612 (1980) (despite defendant's young age, emotional problems, poor childhood home life, and lack of adult criminal record, death penalty affirmed upon finding that the killing was done for pecuniary gain and in a depraved manner).

The trial judge also considered the fact that defendant did not know his natural father, that his first stepfather was an alcoholic, and that he was raised by his mother. We have previously addressed this issue in *State v. Wallace,* 160 Ariz. 424, 773 P.2d 983 (1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1513, 108 L.Ed.2d 649 (1990). The defendant in *Wallace* argued that the trial court erred in failing to find his family background as a mitigating factor, even though he requested no such finding. We stated that:

A difficult family background, in and of itself, is not a mitigating circumstance. If it were, nearly every defendant could point to some circumstance in his or her background that would call for some mitigation. A difficult family background is a relevant mitigating circumstance if a defendant can show that something in

that background had an effect or impact on his behavior that was beyond the defendant's control.

*Id.* 160 Ariz. at 427, 773 P.2d at 986. Defendant has failed to show that his family background had anything to do with the murder he committed. In fact, defendant stated that he felt he had a normal childhood and enjoyed growing up with his mother and stepbrother. Defendant's family background is not a mitigating circumstance in this case.

Similarly, defendant's past heroin, cocaine and amphetamine use and addiction is not a mitigating circumstance. Use of drugs is a mitigating circumstance only if the evidence shows that the drugs "significantly impaired defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law" at the time of the offense. *State v. Zaragoza,* 135 Ariz. 63, 70, 659 P.2d 22, 29, *cert. denied,* 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1356 (1983). Defendant admitted that he has not used these drugs within the last ten years and that drugs were not a factor in the current offense.

We have evaluated the remaining mitigating circumstances considered by the trial court and find them insufficient to warrant leniency.

## EQUAL PROTECTION

■ Defendant argues that no women have been sentenced to death under the present sentencing law, even though women commit 10% of all homicides in Arizona.[2] Defendant argues that sex discrimination is the only explanation for this pattern. We disagree. Our statutory sentencing scheme provides for the death sentence upon a finding of one or more aggravating circumstances and no mitigating circumstances sufficient to warrant leniency. A.R.S. § 13–703. The propriety of the death sentence, therefore, is, and must be, made on a case-by-case basis. The statute is gender-neutral. We addressed a similar issue in *State v. Richmond,* 136 Ariz. 312,

666 P.2d 57, *cert. denied,* 464 U.S. 986, 104 S.Ct. 435, 78 L.Ed.2d 367 (1983) (Defendant claimed that death penalty visited upon poor persons and male persons in disproportionate numbers). We stated:

[N]either the federal constitution nor this court has ever required that the imposition of the death penalty precisely reflect the composition of the general population. What the United States Supreme Court has required is guidelines to bridle the discretion of the sentencing authority, thus minimizing the risk of arbitrary imposition of the death penalty.

*Id.* at 321–22, 666 P.2d at 66–67 (citations omitted). While it is true that Susan was tried and convicted for the same first degree murder, the trial judge found that defendant was the triggerman. A legitimate reason for the disparate sentencing was that defendant did the actual killing. *See State v. Clabourne,* 142 Ariz. 335, 690 P.2d 54 (1984).

The fourteenth amendment to the United States Constitution guarantees an accused equal protection of the laws. It protects against discrimination of a class of persons for which there is no rational basis. *See Marshall v. United States,* 414 U.S. 417, 94 S.Ct. 700, 38 L.Ed.2d 618 (1974). The issue here, as the state points out, is whether defendant is a member of a recognizable class, singled out by law or by practice for distinctive treatment without a rational basis. We believe he is not.

Male murderers are not singled out for capital punishment. The statute does not, on its face, distinguish between the sexes. The only death qualification is a finding of one or more aggravating circumstances and insufficient mitigating circumstances. A.R.S. § 13–703.

■ Additionally, defendant has failed to demonstrate discriminatory application of the capital punishment statute. The record establishes a rational basis for the different penalties in this case. The trial judge found that defendant committed the

---

2. We note that since defendant presented this argument to this court, at least one woman, Debra Jean Milke, has been sentenced to death.

actual killing of David. He also found no mitigating factors sufficient to warrant leniency for defendant. The court, however, did find mitigating factors sufficient to warrant leniency for Susan (no prior criminal record, kind and caring mother, death sentence would be devastating to her six-year-old daughter, potential for violence was minimal, difficult childhood, difficult marriage to Clifford Minter followed by a difficult dissolution). Moreover, the jury foreman wrote to the trial judge following the trial advising him that all twelve jurors recommended leniency for Susan.

We previously defined equal protection as it applies to capital sentencing cases in *State v. Maloney:*

> Equal protection of the laws here means only that the death penalty may be applied to all persons in the state in a like position. And, in Arizona, all persons charged with murder in the first degree, face possible imposition of the extreme penalty. Equality of treatment does not destroy individualization of sentencing to fit the crime and the individual persons convicted of the same crime can constitutionally be given different sentences.

105 Ariz. 348, 354, 464 P.2d 793, 799, *cert. denied,* 400 U.S. 841, 91 S.Ct. 82, 27 L.Ed.2d 75 (1970) (citations omitted). We find no merit to defendant's equal protection claim.

### DENIED RIGHT TO MITIGATION EVIDENCE

■ Counsel claims that after defendant was sent to prison, he began exhibiting bizarre behavior. We denied counsel's previous motion to this court to have defendant's competency examined. Counsel now claims that without a mental and neurological examination, it is impossible to say that defendant's behavior is not the result of a mental impairment that predated the murder. As a result, counsel now claims that defendant was denied the right to present all mitigating evidence to this court.

Defendant did not present this issue in the trial court and we cannot, absent any record, review it on appeal. Defendant may present this issue for determination by the trial court pursuant to rule 32, Ariz. R.Crim.P. Only after defendant exhausts that avenue and the trial court makes a finding, will we consider this issue on appeal.

### DEATH PENALTY CONSTITUTIONAL

Defendant next makes a number of arguments alleging that Arizona's death penalty statute is unconstitutional. As noted above, the United States Supreme Court upheld Arizona's capital punishment statute against constitutional attack in *Walton v. Arizona,* —— U.S. ——, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). Specifically, the Court held that the statute does not improperly burden defendants with the task of establishing mitigating circumstances. *Id.* at ——, 110 S.Ct. at 3055, 111 L.Ed.2d at 525–526; *see also Lewis v. Jeffers,* —— U.S. ——, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990).

Defendant argues that A.R.S. § 13–703 is unconstitutional because it mandates death whenever aggravating and no mitigating circumstances are found. We have previously addressed this question and have held that the statute is constitutionally sound. *State v. Walton,* 159 Ariz. 571, 769 P.2d 1017 (1989); *State v. Vickers,* 159 Ariz. 532, 768 P.2d 1177 (1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 3298, 111 L.Ed.2d 806 (1990); *State v. Beaty,* 158 Ariz. 232, 762 P.2d 519 (1988), *cert. denied,* 491 U.S. 910, 109 S.Ct. 3200, 105 L.Ed.2d 708 (1989); *State v. Correll,* 148 Ariz. 468, 715 P.2d 721 (1986). Moreover, in *Walton v. Arizona,* the United States Supreme Court addressed this very issue and upheld Arizona's capital punishment statute against constitutional attack. —— U.S. ——, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), *see also Lewis v. Jeffers,* —— U.S. ——, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990).

■ Additionally, we have expressly addressed defendant's remaining arguments in other cases before this court. *State v. Walton,* 159 Ariz. 571, 769 P.2d 1017 (1989) (death penalty does not impose improper burden on defendant to prove mitigating

factors; death penalty not unconstitutional because trial court not required to find beyond reasonable doubt that aggravating circumstances outweigh mitigating circumstances; exclusion of jury involvement at sentencing not unconstitutional; death penalty is not cruel and unusual punishment); *State v. Vickers,* 159 Ariz. 532, 768 P.2d 1177 (1989), *cert. denied,* — U.S. —, 110 S.Ct. 3298, 111 L.Ed.2d 806 (1990) (Arizona's death penalty statute does not preclude the sentencer from considering all relevant mitigating circumstances, thereby presuming death the appropriate sentence); *State v. Beaty,* 158 Ariz. 232, 762 P.2d 519 (1988), *cert. denied,* 491 U.S. 910, 109 S.Ct. 3200, 105 L.Ed.2d 708 (1989) (lack of ascertainable standards for the sentencing judge to measure the relative weights of aggravating and mitigating circumstances does not make imposition of the death penalty arbitrary and irrational); *State v. Rossi,* 154 Ariz. 245, 741 P.2d 1223 (1987) (right to voir dire trial judge concerning possible bias or prejudice is not encompassed within constitutional right to fair trial before impartial judge); *State v. Rossi,* 146 Ariz. 359, 706 P.2d 371 (1985) (prosecutor's discretion to decide in which cases the death penalty will be sought does not make death penalty unconstitutional); *State v. Correll,* 148 Ariz. 468, 715 P.2d 721 (1986) (jury has no right to determine aggravating factors). Moreover, we find that imposing the death penalty on the facts of this case is not cruel and unusual punishment. Defendant has presented no compelling basis for overruling this body of case law and we decline to do so.

## PROPORTIONALITY

■ In cases imposing the death penalty, we conduct a proportionality review to determine "whether the sentences of death are excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *State v. Richmond,* 114 Ariz. 186, 196, 560 P.2d 41, 51, *cert. denied,* 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977).

In *State v. Watson,* we held that "[t]he death penalty should be reserved for only

the most aggravating of circumstances, that are so shocking or repugnant that the murder stands out above the norm of first degree murders, or the background of the defendant sets him apart from the usual murderer." 129 Ariz. at 63, 628 P.2d at 946. The "above the norm" standard is disjunctive, meaning that the crime be above the norm of first degree murders *or* the defendant's background sets him apart from the usual murderer. *See State v. Blazak,* 131 Ariz. 598, 604, 643 P.2d 694, 700, *cert. denied,* 459 U.S. 882, 103 S.Ct. 184, 74 L.Ed.2d 149 (1982). We have already noted that this crime is above the norm of first degree murders.

Defendant cites *State v. Madsen* to support his contention that the death sentence in this case is disproportionate to the death sentence in other cases. 125 Ariz. 346, 609 P.2d 1046, *cert. denied,* 449 U.S. 873, 101 S.Ct. 213, 66 L.Ed.2d 93 (1980). As discussed earlier, however, *Madsen* had insufficient evidence of pecuniary motive to qualify as an aggravating circumstance warranting the death penalty. In this case, however, ample evidence demonstrates the aggravating circumstance of pecuniary gain. Defendant "committed the murder for the purpose of receiving the insurance proceeds." *Id.* 125 Ariz. at 353, 609 P.2d at 1053.

Defendant argues that, in *State v. Brookover,* 124 Ariz. 38, 601 P.2d 1322 (1979), Brookover's death sentence was reduced to life imprisonment even though Brookover "cold-bloodedly killed a person." Defendant then suggests that "his conduct is far less egregious than Brookover's and that his mitigating circumstances far outweigh Brookover's." We disagree.

It is difficult to conceive how defendant characterizes his conduct as less evil than Brookover's. In *Brookover,* the defendant shot his victim twice in the back. The killing occurred during the middle of a drug transaction, when such crimes are more likely to take place. Brookover's one aggravating circumstance was a previous conviction for selling marijuana.

In contrast, the victim here (David) was coming home from work, to his own house,

to his new wife. Defendant was having an affair with David's wife Susan. Defendant and Susan had planned the killing for some time, in order to benefit from David's life insurance policy. Defendant was waiting for David to come home, and when David arrived, defendant sprang from his hiding place and shot him once in the chin. David fell to the ground, then ran to the back door and pleaded with his wife to let him in. Defendant followed and shot David in the back, then ran. David then stumbled across the street to a neighbor's house, where he finally collapsed. He later died in the hospital by asphyxiation.

Defendant's mitigating circumstances do not outweigh Brookover's. Brookover's psychiatric experts testified that he suffered from a neurological lesion that tends to lead 50–60 percent of persons similarly afflicted "in the direction of antisocial or asocial behavior." *Brookover*, 124 Ariz. at 41, 601 P.2d at 1325. Moreover, Brookover suffered "a relinquishment of [his] self autonomy" and a "true suspension of reality" during the crime. *Id.* Brookover's "mental condition was not only a mitigating factor, but a major and contributing cause of his conduct...." *Id.* at 42, 601 P.2d at 1326. In the instant case, defendant was fully aware of his actions. Any comparison to *Brookover* is misplaced.

Finally, defendant cites *State v. Watson*, 129 Ariz. 60, 628 P.2d 943 (1981), as evidence that his death sentence is disproportional to the death sentence in other cases. Again, we disagree. In *Watson*, the defendant, along with an accomplice, entered the victim's home to burglarize it and rob the occupants. Evidence in the record indicated that Watson committed the same crime earlier that evening at another residence, and that neither of the occupants was harmed. Watson also attempted the same crime at a third residence, but was thwarted. Only after the victim located his revolver and began firing did Watson shoot back and kill the victim.

While the defendant in *Watson* had prior convictions, he did not embark on his crime spree for the purpose of taking human life. Watson did not deliberate the killing over a period of months and finally conclude that he must take another's life. Rather, he placed himself in a situation in which death was more likely to occur. While all killings are horrible, we believe there is a difference between the taking of human life with exacting, premeditated coolness, as here, and the hasty, impulsive taking of life that evolves from other criminal activity, as in *Watson*. *See also State v. Gerlaugh*, 144 Ariz. 449, 461, 698 P.2d 694, 706 (1985). This murder was not unexpected or accidental. *Cf. State v. Poland*, 132 Ariz. 269, 645 P.2d 784 (1982) (drowning Purolator guards after robbery); *State v. Hensley*, 142 Ariz. 598, 691 P.2d 689 (1984) (shooting victims to facilitate escape). We do not believe that the death sentence in this case is disproportional to the sentence in *Watson*.

We further note the following cases in evaluating the propriety of defendant's death sentence. In *State v. Clabourne*, 142 Ariz. 335, 690 P.2d 54 (1984), the defendant, along with two others, kidnapped and raped the victim. Defendant then, apparently at the prompting of one co-defendant, strangled and stabbed the victim. Defendant alleged that his death sentence was disproportionate because neither of his co-defendants received the death penalty. We stated that a "legitimate reason for this disparate treatment" was that defendant did the actual killing, whereas the co-defendants did not participate in the actual killing. *Id.* at 349, 690 P.2d at 68.

Similarly, in *State v. Gerlaugh*, 144 Ariz. 449, 698 P.2d 694 (1985), we refused to overturn defendant's death sentence because of the disparate sentences awarded to his co-defendants. (co-defendants held victim down while defendant repeatedly drove a car over him and subsequently stabbed him between 20–30 times). *See also State v. Lambright*, 138 Ariz. 63, 673 P.2d 1 (1983), *cert. denied*, 469 U.S. 892, 105 S.Ct. 267, 83 L.Ed.2d 203 (1984) (mere fact that an accomplice has received leniency does not, in itself, prevent imposition of the death penalty). We find that the resolution of this case is not disproportionate to the above cited cases.

## CONCLUSION

We have searched the record for fundamental error pursuant to A.R.S. § 13–4035 and found none. The trial court's judgment of conviction and sentence are, therefore, affirmed.

GORDON, C.J., concurs.

CORCORAN, Justice, specially concurring:

I concur in affirming the judgment of conviction and the sentence of death, but write separately because I do not believe this court must or should conduct a comparative proportionality review before it affirms a death sentence.

Comparative proportionality review refers to the practice of comparing the defendant's sentence with the punishment imposed on *others* convicted of the *same* crime. This type of appellate review has nothing to do with traditional requirements under the eighth amendment's prohibition against cruel and unusual punishment,[3] and is not mandated by the Arizona Constitution, death penalty statutes, or procedural rules. It is strictly a judicial invention by which this court assumes authority to modify an otherwise appropriate death penalty in an attempt to ensure that defendants in similar cases receive similar sentences.

My purpose in writing is not to criticize the court's ultimate objective or, as Justice Feldman's special concurrence submits, to argue that we should never check our capital sentencing procedures for "resulting aberrations." Rather, I write to suggest that, in light of other and more effective safeguards, we need not conduct a comparative proportionality review to promote the "evenhanded, rational, and consistent" application of Arizona's death penalty. *Jurek v. Texas*, 428 U.S. 262, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976). In fact, the erratic and protean proportionality reviews performed by this court do little to enhance consistency, and may even result

in the freakish reduction of the death penalty. So long as arbitrary and capricious sentencing is the touchstone under constitutional analysis, *see Gregg v. Georgia,* 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976) (Stewart, J., Powell, J., and Stevens, J., announcing judgment of the court), we are no more justified in exercising unbridled discretion to reduce to life than to wantonly require death. Comparative proportionality review, therefore, serves no principled purpose and should be discontinued.

### I. *Federal Proportionality Requirements*

Historically, the eighth amendment merely ensured that the severity of the crime justified the severity of the sentence; it did not guarantee that a given defendant's sentence matched sentences imposed on others for similar crimes. *See Pulley v. Harris,* 465 U.S. 37, 43 & n. 6, 104 S.Ct. 871, 875–76 & n. 6, 79 L.Ed.2d 29 (1984). Legislatures and appellate courts rarely examined proportionality in a comparative sense until after the Supreme Court's decision in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), which held that the death penalty, in light of its uniqueness and severity, could not be imposed under sentencing procedures that created a substantial risk of "arbitrary and capricious" decision-making. *See Gregg,* 428 U.S. at 188, 96 S.Ct. at 2932. In so doing, *Furman* merged traditional eighth amendment analysis with notions of fundamental fairness underlying due process, *see State v. Ramseur,* 106 N.J. 123, 349, 524 A.2d 188, 303 (1987), and ultimately required the overhaul of many existing capital-sentencing statutes to prevent the wanton and freakish imposition of death sentences. *See Pulley,* 465 U.S. at 44, 104 S.Ct. at 876.

As part of an effort to comply with *Furman,* many states endorsed cross-case appellate review demonstrating that similarly situated defendants received the same sentences. *See, e.g., Gregg,* 428 U.S. at 198,

---

**3.** The eighth amendment applies to the states through the fourteenth amendment to the United States Constitution. *See Pulley v. Harris,* 465 U.S. 37, 43–44, 104 S.Ct. 871, 876, 79 L.Ed.2d 29 (1984).

96 S.Ct. at 2937 (Georgia statute required comparative proportionality review); *Proffitt v. Florida,* 428 U.S. 242, 250–51, 259, 96 S.Ct. 2960, 2966, 2969–70, 49 L.Ed.2d 913 (1976) (Florida appellate court performs a proportionality review despite the absence of a statutory requirement). This practice became so commonplace, in fact, that some defendants demanded comparative sentence review as a matter of constitutional right. *See, e.g., Pulley,* 465 U.S. at 39–40, 104 S.Ct. at 874 (defendant challenged the California capital punishment statute because it failed to require the state supreme court to perform a comparative proportionality review).

*Furman* and its progeny, however, did not "establish proportionality review as a constitutional requirement." *Pulley,* 465 U.S. at 45, 104 S.Ct. at 876; *accord Walton v. Arizona,* —— U.S. ——, ——, 110 S.Ct. 3047, 3058, 111 L.Ed.2d 511 (1990) (proportionality review not required under Arizona's sentencing scheme); *State v. Serna,* 163 Ariz. 260, 269, 787 P.2d 1056, 1065 (1990) (proportionality review not mandated by the United States Constitution). As the Supreme Court explained,

> [T]hat some [state] schemes providing proportionality review are constitutional does not mean that such review is indispensable. We take statutes as we find them. To endorse the statute as a whole is not to say that anything different is unacceptable. As was said in *Gregg,* "[w]e do not intend to suggest that ... any sentencing system constructed along these general lines would inevitably satisfy the concerns of *Furman,* for each distinct system must be examined on an individual basis." 428 U.S. at 195, 96 S.Ct. at 2935 (footnote omitted).

*Pulley,* 465 U.S. at 44–45, 104 S.Ct. at 876. The disparate results criticized in *Furman,* to be sure, resulted from "statutes vesting unguided sentencing discretion in *juries* and *trial judges," Pulley,* 465 U.S. at 44, 104 S.Ct. at 876 (emphasis added),[4] not from defective judicial review on appeal.

*Furman* is *best* satisfied, therefore, not by any specific type of appellate review, but by carefully drafted statutes coupled with precise application ensuring that the sentencing authority at a bifurcated proceeding receives "adequate information and guidance" and focuses "on the particularized circumstances of the *crime* and the *defendant." Gregg,* 428 U.S. at 195, 199, 96 S.Ct. at 2935, 2937 (emphasis added); *see also McCleskey v. Kemp,* 481 U.S. 279, 307, 107 S.Ct. 1756, 1775, 95 L.Ed.2d 262 (1987). If the sentencing authority concentrates sufficiently "on the particularized nature of the crime and the particularized characteristics of the individual defendant," *Gregg,* 428 U.S. at 206, 96 S.Ct. at 2941, an appellate court "lawfully may presume," without regard to comparative proportionality, that death sentences are not wantonly or freakishly imposed. *Walton,* —— U.S. at ——, 110 S.Ct. at 3058; *McCleskey,* 481 U.S. at 308, 107 S.Ct. at 1775.

In *Jurek,* for example, the Court sustained the Texas death statute primarily because of the limitations placed on the jury's sentencing discretion. 428 U.S. at 276, 96 S.Ct. at 2958. The Court manifested little concern for appellate practices. *See Pulley,* 465 U.S. at 49–50, 104 S.Ct. at 878–79. Neither the state statute, as in Georgia (*Gregg*), nor state case law, as in Florida (*Proffitt*), required the Texas Supreme Court to make a comparative proportionality inquiry. *Id.* at 48, 104 S.Ct. at 878. The Texas statute required only some sort of prompt or automatic "judicial review of the jury's decision in a court with statewide jurisdiction." *Id.* at 49, 104 S.Ct. at 878. The Supreme Court later relied on *Jurek* to sustain California's death penalty statutes and procedures, which were similarly silent as to a comparative proportionality requirement. *Id.* at 50–51, 104 S.Ct. at 879. *Jurek,* therefore, illustrates the established rationale behind the Supreme Court's refusal to require comparative proportionality review under *Furman:* so long as a state's capital sentencing procedures are sufficiently tailored and guided,

---

**4.** *See also Pulley,* 465 U.S. at 55, 104 S.Ct. at 881–82 (Stevens, J., concurring in part and concurring in the judgment) (arbitrary results were also caused by permitting death sentences in broad classes of offenses).

defendants "cannot prove a constitutional violation by demonstrating that other defendants who may be similarly situated did *not* receive the death penalty." *McCleskey,* 481 U.S. at 306–07, 107 S.Ct. at 1775 (emphasis in original).

In theory, then, comparative proportionality review is premised on the faulty notion that the United States Constitution requires total uniformity in capital sentencing. Our federal constitution, however,

> *is not offended by inconsistency in results based on the objective circumstances of the crime.* Numerous legitimate factors may influence the outcome of a trial and a defendant's ultimate sentence, even though they may be irrelevant to his actual guilt. If sufficient evidence to link a suspect to a crime cannot be found, he will not be charged. The capability of the responsible law enforcement agency can vary widely. Also, the strength of the available evidence remains a variable throughout the criminal justice process and may influence a prosecutor's decision to offer a plea bargain or to go to trial. Witness availability, credibility, and memory also influence the results of prosecutions. Finally, sentencing in state courts is generally discretionary, so a defendant's ultimate sentence necessarily will vary according to the judgment of the sentencing authority. *The foregoing factors necessarily exist in varying degrees throughout our criminal justice system.*

*McCleskey,* 481 U.S. at 307 n. 28, 107 S.Ct. at 1775 n. 28 (emphasis added).

## II. *Arizona Proportionality Requirements*

Arizona, like Florida (*Proffitt*), adopted comparative proportionality review strictly by judicial decree. In a line of post-*Furman* cases beginning with *State v. Richmond,* this court stated that it could not conduct a "meaningful appellate review of each death sentence" without determining whether the sentence of death is disproportionate to the penalty imposed in similar cases. 114 Ariz. 186, 196, 560 P.2d 41, 51 (1976), *cert. denied,* 433 U.S. 915, 97 S.Ct.

2988, 53 L.Ed.2d 1101 (1977); *State v. McCall,* 160 Ariz. 119, 131, 770 P.2d 1165, 1177 (1989), *cert. denied,* — U.S. ——, 110 S.Ct. 3289, 111 L.Ed.2d 798 (1990); *State v. Beaty,* 158 Ariz. 232, 247–48, 762 P.2d 519, 534–35 (1988), *cert. denied,* 491 U.S. 910, 109 S.Ct. 3200, 105 L.Ed.2d 708 (1989); *State v. Gretzler,* 135 Ariz. 42, 58, 659 P.2d 1, 17, *cert. denied,* 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). The *only* authority cited by the *Richmond* court in support of this rule was the United States Supreme Court's decision in *Gregg,* which upheld a statutory capital sentencing scheme providing for proportionality. 428 U.S. at 198, 96 S.Ct. at 2937. The Supreme Court in *Gregg,* however, did not hold that comparative proportionality was required under federal law, but only by Georgia's death penalty statutes. *Id.; see also Pulley,* 465 U.S. at 46, 104 S.Ct. at 877 ("Court of Appeals erred in concluding that *Gregg* required proportionality review.").

In Arizona, neither our statutes nor official court rules require or empower this court to conduct an inter-case proportionality review. A.R.S. § 13-4031 and rule 31.-2(b), Arizona Rules of Criminal Procedure, provide for an automatic appeal to this court when a defendant is sentenced to death, but they do not specify what form our appellate review should take. Similarly, the Arizona Constitution does not provide any alternative basis for comparative proportionality review. As this court recently noted in *State v. Bartlett,*

> Article 2, § 15 of the Arizona Constitution is identically worded to its federal counterpart prohibiting cruel and unusual punishment. The framers of the Arizona Constitution, "in a rare case of using the federal Constitution as a model," adopted the federal wording "cruel *and* unusual punishment" over the committee's proposed wording that neither "cruel *nor* unusual punishment" should be permitted.

> This deliberate adoption of the federal wording expressed the framers' intent to give legislators wide discretion in imposing methods of capital punishment.

164 Ariz. 229, 240–41, 792 P.2d 692, 703–04 (1990) (emphasis in original), *judgment vacated on other grounds,* ——— U.S. ———, 111 S.Ct. 2880, 115 L.Ed.2d 1046 (1991).

*Bartlett* suggests that the Arizona and federal constitutions provide coterminous protection against cruel and unusual punishment. Absent a ruling by this court interpreting article 2, § 15 of the Arizona Constitution more broadly than its federal counterpart, I do not believe a defendant may assert, and this court cannot conclude that a defendant has, a separate right ·to comparative proportionality review on state constitutional grounds.

### III. *Arguments Against Proportionality Review*

This court occasionally endorses comparative proportionality analysis as if it were the ultimate fail-safe against errant death penalties and, therefore, an essential element of the state's death penalty scheme. I believe, however, that comparative proportionality review inappropriately adds an unnecessary and uncertain test to the state's sentencing procedures. Also, because the court compares death sentences in both an inconsistent and incomplete manner, comparative proportionality review lacks the capacity to eradicate the systemic arbitrariness it seemingly seeks to prevent.

### A. Safeguards Under Arizona's Sentencing Scheme

While sentencing procedures in other states may give rise to a need for comparative proportionality review as "an additional safeguard against arbitrary or capricious sentencing," *Pulley,* 465 U.S. at 45, 104 S.Ct. at 877, Arizona's capital-sentencing scheme does not. Our death statute applies only to defendants found guilty of first-degree murder as defined under state law, ·and permits the death penalty *only* when the sentencing judge, during a separate sentencing hearing, finds that at least one of the 10 statutory aggravating circumstances is present and that no mitigating circumstances · warrant leniency. A.R.S. § 13–703(A)–(C), (E)–(G); *Gretzler,* 135 Ariz. at 54, 659 P.2d at 13 (statute prohibits a death sentence when none of the aggravating circumstances are found). Decisions by this court give substance to the operative terms of the death statute and provide sufficient sentencing guidance to presume that death sentences in Arizona meet constitutional requirements. *Walton,* ——— U.S. at ———, 110 S.Ct. at 3057–58.

Limiting definitions placed on aggravating circumstances, for example, circumscribe the sentencer's discretion within narrow parameters to insure that the death penalty is not arbitrarily, capriciously, or freakishly imposed. *See, e.g., Walton;* ——— U.S. at ———, 110 S.Ct. at 3058 (definition given to the "especially cruel" aggravating factor gives meaningful sentencing guidance). With respect to possible mitigating circumstances, the sentencing judge "must consider any aspect of defendant's character or record and any circumstances of the offense relevant to determining whether the death sentence should not be imposed." *McCall,* 160 Ariz. at 131, 770 P.2d at 1177, *citing Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). Taken together, these procedures strike the requisite balance "between the need for flexibility in order to afford individualized decision-making essential in capital cases, and the need for appropriate standards to prevent the arbitrariness that accompanies unbridled discretion." *State v. Mata,* 125 Ariz. 233, 242, 609 P.2d 48, 57, *cert. denied,* 449 U.S. 938, 101 S.Ct. 338, 66 L.Ed.2d 161 (1980).

Further, our review of death cases goes the second constitutional mile without the aid of comparative proportionality analysis. Although the Supreme Court does not require any specific or heightened standard of appellate review in capital cases, *Proffitt,* 428 U.S. at 258, 96 S.Ct. at 2969,[5] we undertake an extensive, independent re-

---

**5.** *See also Pulley,* 465 U.S. at 53, 104 S.Ct. at 880–81 (thoughtful appellate review is adequate in California); *Barefoot v. Estelle,* 463 U.S. 880, 892–95, 103 S.Ct. 3383, 3394–95, 77 L.Ed.2d 1090 (1983) (permitting "expedited" review of death sentences so that decisions are "not delayed by the weight of other business"); *Jurek,* 428 U.S. at 276, 96 S.Ct. at 2958 ("prompt" appellate review is sufficient in Texas).

view of each death sentence handed down under Arizona law. As explained in *State v. Watson*, "[a] finding merely that the imposition of the death penalty by the trial court was 'factually supported' or 'justified by the evidence' " is not the appellate treatment that the death penalty warrants. 129 Ariz. 60, 63, 628 P.2d 943, 946 (1981). We must determine for ourselves, based upon an independent review of the entire record, whether "we believe that the death penalty should be imposed." *Id.*

This independent review includes a painstaking search of the entire record for error, an examination of the facts that establish the presence or absence of aggravating and mitigating circumstances, and a separate determination of whether the latter circumstances outweigh the former when both are present. *Richmond*, 114 Ariz. at 196, 560 P.2d at 51; *see, e.g., State v. Rockwell*, 161 Ariz. 5, 15–16, 775 P.2d 1069, 1079–80 (1989) (death sentence reduced because mitigating evidence questioned the propriety of the penalty); *State v. Prince*, 160 Ariz. 268, 275–76, 772 P.2d 1121, 1128–29 (1989) (sentence reduced to life because state failed to prove an aggravating circumstance); *State v. Mauro*, 159 Ariz. 186, 207–08, 766 P.2d 59, 80–81 (1988) (sentence reduced to life because defendant's mental impairment was a substantial mitigating factor); *Watson*, 129 Ariz. at 64, 628 P.2d at 947 (death sentence set aside because mitigating circumstances outweighed aggravating circumstances). To provide yet another screen in cases posing any doubt whether the death penalty should be imposed, this court has resolved such doubt "in favor of a life sentence." *Rockwell*, 161 Ariz. at 16, 775 P.2d at 1080; *State v. Valencia*, 132 Ariz. 248, 250, 645 P.2d 239, 241 (1982).

The value of comparative proportionality review, proponents say, is that it compels the court to coordinate its actions with prior decisions in similar cases, thereby fostering uniform results. The independent review referenced above, however, already focuses the court's attention on prior, comparable cases. Section 13–703(F), for example, simply lists the 10 possible aggravating circumstances applicable to any giv-

en case. To determine the exact meaning and parameters of a particular aggravating circumstance, we must look at previous cases to see how the court interpreted § 13–703(F) in light of similar facts. *See, e.g., Gretzler*, 135 Ariz. at 50–53, 659 P.2d at 9–12 (court held that the statutory phrase "especially heinous, cruel, or depraved" has been construed in a constitutionally narrow fashion and examined its application in individual cases). The court employs the same strategy to review mitigating circumstances under § 13–703(G). *See, e.g., Rockwell*, 161 Ariz. at 15, 775 P.2d at 1079 (prior cases helped determine whether a defendant's age may be a substantial and relevant mitigating factor). By verifying that certain aggravating or mitigating circumstances apply only to cases involving similar facts, our independent review performs an appropriate comparative function.

Moreover, because of the wide range of mitigating evidence a defendant may proffer, *see McCall*, 160 Ariz. at 131, 770 P.2d at 1177, this court occasionally weighs leniency afforded other defendants as a mitigating factor. Leniency granted to an accomplice under a plea agreement, for example, "does *not* in itself prevent the imposition of the death penalty," *State v. Marlow*, 163 Ariz. 65, 72, 786 P.2d 395, 402 (1989) (emphasis added), but we will consider such leniency "*along with other mitigating circumstances* in determining whether to impose the death penalty." *State v. Lambright*, 138 Ariz. 63, 76, 673 P.2d 1, 14 (1983) (emphasis added), *cert. denied*, 469 U.S. 892, 105 S.Ct. 267, 83 L.Ed.2d 203 (1984).

In my opinion, comparative proportionality review serves little, if any, purpose that is not already accomplished by way of Arizona's narrowly construed death statute and our independent review of the statutory aggravating and mitigating circumstances in each case. A sufficiently narrow death statute alone "insures that the death penalty will only be imposed for the most serious crimes [and] ... that [it] will only be imposed for the *same type of offenses* which occur under the *same types of*

*circumstances." Jurek,* 428 U.S. at 270, 96 S.Ct. at 2955 (emphasis added); *see also Gregg,* 428 U.S. at 206–07, 96 S.Ct. at 2941 (jury is unable to impose a freakish death sentence if "it is always circumscribed by the legislative guidelines"). Once this court evaluates the sentencing judge's compliance with the state's death statutes and then performs a separate review to provide added protection against arbitrariness and caprice, comparative proportionality review becomes an empty ritual. *See Walton,* —— U.S. at ——, 110 S.Ct. at 3058 (comparative proportionality review by the Arizona Supreme Court is not required because the death statute is construed "in a manner that furnishes sufficient guidance to the sentencer"); *Pulley,* 465 U.S. at 49, 104 S.Ct. at 878–79 (comparative proportionality review by the Texas Supreme Court is constitutionally superfluous).

### B. Defects in Proportionality Review

The argument that a comparative proportionality review acts as a check against the random and arbitrary imposition of the death penalty also assumes, necessarily, that the comparative review mechanism itself is not freakishly applied or inherently arbitrary. Such is not the case with the proportionality reviews conducted by this court.

First, the court's application of comparative proportionality analysis is by no means a model of regularity. The court frequently purports to compare a defendant's death sentence with penalties imposed for similar crimes, but its analysis is simply a "cursory or rubber-stamp" type of review. *Proffitt,* 428 U.S. at 259, 96 S.Ct. at 2969; *see, e.g., State v. Moorman,* 154 Ariz. 578, 587, 744 P.2d 679, 688 (1987) (death sentence is proportional because the "facts speak for themselves" here); *State v. Gerlaugh,* 135 Ariz. 89, 90, 659 P.2d 642, 643 (1983) (this court believed that "no useful purpose would be served in comparing, discussing or citing other homicide cases"); *Mata,* 125 Ariz. at 242, 609 P.2d at 57 (court cited no cases in ruling defendant's death sentence not excessive).

In other situations the court either forgets or ignores its self-imposed proportionality review requirement. In *State v. Arnett,* for example, we reviewed defendant's death sentence on three separate occasions and failed each time to perform a formal proportionality review. 158 Ariz. 15, 760 P.2d 1064 (1988); 125 Ariz. 201, 608 P.2d 778 (1980); 119 Ariz. 38, 579 P.2d 542 (1978); *see also State v. Greenawalt,* 128 Ariz. 150, 624 P.2d 828 (no formal proportionality review), *cert. denied,* 454 U.S. 882, 102 S.Ct. 364, 70 L.Ed.2d 191 (1981); *State v. Bishop,* 127 Ariz. 531, 622 P.2d 478 (1980) (same); *State v. Ceja,* 115 Ariz. 413, 565 P.2d 1274 (same), *cert. denied,* 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977); *State v. Knapp,* 114 Ariz. 531, 562 P.2d 704 (1977) (same), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978). If the fair application of our state's death penalty depends in any way on inter-case sentence comparison, this court should have honored its own proportionality review requirement as a matter of *practice* as well as theory.

Second, the scope of the court's proportionality inquiry varies from case to case. Because *Richmond* did not define or describe the "similar cases" to which a given death sentence should be compared, *see* 114 Ariz. at 196, 560 P.2d at 51, the court employs different standards in different cases to assess the similarity of sentences. The most common technique is to compare a death case with cases from this and other jurisdictions in which the death penalty was imposed, including cases in which the sentence was either reversed or reduced on appeal. *See, e.g., State v. Amaya–Ruiz,* 166 Ariz. 152, 179, 800 P.2d 1260, 1287 (1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2044, 114 L.Ed.2d 129 (1991). This court, however, frequently modifies its approach and excludes similar cases from other jurisdictions. *See, e.g., State v. Comer,* 165 Ariz. 413, 429–30, 799 P.2d 333, 349–50 (1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1404, 113 L.Ed.2d 460 (1991); *State v. Wallace,* 160 Ariz. 424, 428, 773 P.2d 983, 987 (1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1513, 108 L.Ed.2d 649 (1990); *State v. LaGrand,* 153 Ariz. 21, 37, 734 P.2d 563, 579, *cert. denied,* 484 U.S. 872, 108 S.Ct.

207, 98 L.Ed.2d 158 (1987); *State v. Hensley*, 142 Ariz. 598, 604, 691 P.2d 689, 695 (1984). We have yet to explain why one defendant is entitled to a more extensive comparative proportionality review than that afforded to another.

By far the most serious defect in the scope of our proportionality review, however, is the court's unwillingness to include *all* first-degree murder cases. In *State v. Ortiz*, this court stated that it would consider all cases "where the death penalty *could* be imposed" so that the death penalty is not applied arbitrarily or capriciously. 131 Ariz. 195, 207, 639 P.2d 1020, 1032 (1981) (emphasis added), *cert. denied*, 456 U.S. 984, 102 S.Ct. 2259, 72 L.Ed.2d 863 (1982). In practice, however, we consider *only* those cases in which the court affirmed or vacated a death sentence on appeal. *See State v. LaGrand*, 152 Ariz. 483, 490, 733 P.2d 1066, 1073 (true proportionality review does not require an examination of particular types of cases), *cert. denied*, 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987).

"[T]he court excludes from the pool of potentially similar cases to be considered for comparative purposes any first-degree murder case in which the defendant originally received only a life sentence." Pulaski, *Capital Sentencing in Arizona: A Critical Evaluation*, 1984 Ariz.St.L.J. 1, 51; *see, e.g., Amaya–Ruiz*, 166 Ariz. at 179, 800 P.2d at 1287 (citing no first-degree murder cases in which defendant initially received a life sentence); *Comer*, 165 Ariz. at 429–30, 799 P.2d at 349–50 (same). One observer concludes that doing so essentially skews the outcome of any proportionality review in favor of the death sentence. If the pool "is made up only of cases in which the defendants' sentences are death, the death penalty under review will naturally be found comparatively proportionate." Note, *Criminal Procedure: Comparative Proportionality Review of Death Sentences: Is it a Meaningful Safeguard in Oklahoma?*, 38 Okla.L.Rev. 267, 278 (1985). Even in its best dress, therefore, our form of comparative proportionality review cannot possibly provide what its label

suggests—a fair proportionality assessment.

Despite the many problems associated with comparative proportionality review, the majority insists on its continued use, arguing that it is better to improve the court's procedures and employ every method available to reduce our errors. That argument, however, asks this court to fix a procedure that simply cannot be fixed. No matter how skilled the court becomes at comparing "similar cases," comparative proportionality review will never fulfill its intended purpose because it seeks an impossible result—complete uniformity at the end of a process that is constitutionally required under *Furman* to provide an individualized assessment of each defendant.

Moreover, I believe comparative proportionality review simply invites appellate error by permitting this court to modify death sentences deemed otherwise appropriate by our independent review, thereby giving birth to a new class of mercy-eligible defendants whose ranks we have no way of specifying in advance. This power to reduce to life requires comparisons with records not presently before the court and opens the door to the deliberation of inappropriate sentencing factors such as sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling. *California v. Brown*, 479 U.S. 538, 543, 107 S.Ct. 837, 840, 93 L.Ed.2d 934 (1987) (sentencing authority should not focus on extraneous emotional factors); *see also Beaty*, 158 Ariz. at 247, 762 P.2d at 534 (discussing the need to reduce the "human element" in the imposition of the death penalty).

If the sentencing judge has no right to engage in such speculation or to consider his or her own subjective belief as to the appropriateness of a penalty, we have no greater authority to do so on appeal. Narrowly tailored and individualized sentencing is the hallmark of a constitutional death penalty scheme under our present jurisprudence. By expanding the range of permissible discretion on appeal, however, we move our sentencing procedures farther away from the constitutional mark and risk

the same unguided, emotional results denounced since *Furman*. Thus, with all due respect to the majority, comparative proportionality review does not "recognize our own fallibility," but compounds it by adding a subjective variable.

## IV. *Conclusion*

I commend the majority's attempt to provide death-eligible defendants with extra-constitutional protection against the arbitrary and capricious application of this state's most severe punishment. Nevertheless, like all other reforms carried to an extreme, the appellate procedures in this area are themselves in need of reform. In the almost 15 years since *Richmond*, we have had ample opportunity to determine whether comparative proportionality review is a worthwhile and effective endeavor. We know now through experience and logic that it fails in both respects. Therefore, until we are required by federal or state constitutional authority or Arizona statute to establish a comparative sentence mechanism and this court adopts adequate guidelines for its application, I believe we should abandon comparative proportionality review.

MOELLER, Justice, specially concurring.

Because no statutory or constitutional basis exists to allow this court to engage in its own proportionality reviews in death penalty cases, I concur in Justice Corcoran's well-reasoned special concurrence and join him in urging the court to discontinue the practice.

Proportionality reviews in Arizona death penalty cases had their origin in this court's mistaken belief that such reviews were mandated by the United States Supreme Court. That Court has now made it clear that proportionality reviews are *not* constitutionally required. *Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Although some states independently have chosen to require proportionality reviews by legislation, Arizona has not. Under these circumstances, I do not share the majority's reluctance to abandon a

practice that was adopted originally because of a mistaken perception of the law.

The logic of Justice Corcoran's special concurrence is persuasive, as Justice Feldman acknowledges in his separate special concurrence. Justice Feldman, however, relying on Mr. Justice Holmes' famous aphorism, rejects the "logic" of Justice Corcoran's argument and, instead, relies on "experience." My experience in the abyss of death penalty litigation leads me to the firm conclusion that it is both improper and undesirable to continue a practice that is neither legislatively nor constitutionally authorized. As is well-known to members of this court, our continued use of proportionality reviews is itself being attacked in death penalty litigation. *See, e.g.,* the recent case of *State v..Smith*, Nos. CR–89–0174–PC and CR–91–0224–PC, review denied June 11, 1991. Similar attacks on proportionality review will doubtless continue and intensify as other attacks on the death penalty fail.

Although I assume that this court, which created proportionality review in Arizona, will uphold its legality, whether other courts will do so is far less certain. What is certain, however, is that the unauthorized proportionality review procedure will continue to provide yet another vehicle to further delay the already excruciatingly slow review process in death penalty cases. Thus, I draw a different conclusion from application of the Holmes' dictum concerning experience than does my colleague Justice Feldman—my conclusion is that it is unwise to inject gratuitous issues into death penalty litigation. Not wishing to prolong death penalty litigation beyond that which is appropriate to provide a full, proper, and constitutional review in each case, I join Justice Corcoran in urging abolition of separate proportionality reviews.

In short, no constitutional or statutory authorization exists to permit this court to set aside an otherwise appropriate death penalty merely because three members of this court conclude, pursuant to a self-created proportionality review process, that they believe life imprisonment is the preferable punishment in a given case. Accord-

ingly, I concur in all portions of the majority's opinion except that portion entitled "Proportionality," and, on that subject, I join Justice Corcoran's special concurrence.

FELDMAN, Vice Chief Justice, specially concurring.

I concur in the opinion and the result but write separately to state my views on proportionality· review.

In his special concurrence, Justice Corcoran advocates abolishing this court's practice of conducting proportionality reviews in capital cases. As he concedes (at 519, 815 P.2d at 888), this court has followed the practice in a long line of cases, most recently in *State v. Stanley*, 167 Ariz. 519, 809 P.2d 944 (1991). If we are to overrule all of these cases, it should only be for compelling reasons.

The concurrence presents a scholarly exposition of the imperfections in our proportionality review system. With respect, and despite the logic of the argument, I am unable to agree with the conclusion. This is one instance when, as Holmes said, the "life of the law has not been logic: it has been experience." O.W. HOLMES, JR., THE COMMON LAW 1 (1881). I think it important, therefore, to describe the reasons for my disagreement.

In *Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), the United States Supreme Court finally concluded that the United States Constitution does not *require* proportionality review. But the constitution, of course, sets only the minimum requirements, and courts add many procedures designed to do justice on· a case-by-case basis. For instance, Justice Corcoran points out that we undertake an "extensive, independent review" in capital cases, including "an examination of the facts that establish the presence or absence of aggravating or mitigating circumstances, and a separate determination of whether the latter ... outweigh the former...." At 520–521, 815 P.2d at 889–890. None of this is required by the constitution, yet Justices Moeller and Corcoran do not dispute the value of this constitutionally "unauthorized" (at 524, 815 P.2d at

893, Moeller, J. concurring) practice or recommend its abolition. Their point is that this review is good enough. At 521, 815 P.2d at 890. I disagree with this for several reasons.

First, they ask that we " 'lawfully may presume,' without regard to comparative proportionality, that death sentences are not wantonly or freakishly imposed." At 518, 815 P.2d at 887 (citation omitted). I cannot accept a presumption so contrary to everyday observation. Sadly, our history shows that death sentences *have been* arbitrarily, wantonly, and freakishly imposed, often on grounds of race, religion, or minority status. Although we all hope this sad chapter of American history is over, there is no evidence that the consequences of bigotry have been completely eliminated. Even if they have, it is obvious the rich man is much more likely to evade the death penalty than the poor man, the defendant with a good lawyer has a much better chance than the defendant with a poor lawyer, and variations in prosecutors, judges, juries, community emotions, and the type of victim all play some part in the results.

Thus, as Justice Corcoran points out, "an appropriate comparative function" is important. At 521, 815 P.2d at 890. Indeed, even in non-capital cases the United States Supreme Court admonishes us that an "analysis under the Eighth Amendment should be guided by objective criteria, including ... sentences imposed on other criminals in the same jurisdiction...." *Solem v. Helm*, 463 U.S. 277, 292, 103 S.Ct. 3001, 3011, 77 L.Ed.2d 637 (1983). It is hard, of course, to reconcile the holding in *Solem* with the result in *Pulley*, but this court recently applied such a comparative proportionality analysis in opinions written by Justice Corcoran involving non-capital offenses. *See State v. Bartlett*, 164 Ariz. 229, 792 P.2d 692 (1990); *State v. Jonas*, 164 Ariz. 242, 792 P.2d 705 (1990). Surely, if we are to perform a comparative proportionality analysis in non-capital cases, we should continue to undertake it in capital cases.

The inequalities in our system of justice, the occasional miscarriage of justice, inconsistency of result, discrepancies attributa-

ble to wealth, and our history of treatment of various minorities show that a comparative analysis is essential in death cases. I reject the proposition, implicit in the proposal to abolish proportionality review, that a system designed to eliminate aberrant results need never be checked for resulting aberrations.

I believe this, too, is implicit in Justice Corcoran's concurrence: "By verifying that certain aggravating or mitigating circumstances apply only to cases involving similar facts, our independent review performs an appropriate comparative function." At 521, 815 P.2d at 890. What is a comparative review that "occasionally weighs leniency afforded other defendants as a mitigating factor" (*id.* at 521, 815 P.2d at 890) if not a proportionality review?

If there is some difference between this "appropriate comparative function" and the type of proportionality review this court has professed to make since *State v. Richmond,* 114 Ariz. 186, 560 P.2d 41 (1976), then I believe even more strongly that we should continue with the separate proportionality review. The purpose of proportionality review is not "complete uniformity" at the expense of "individualized assessment...." At 523–524, 815 P.2d at 892–893. To the contrary, by closely comparing the circumstances of individual crimes and criminals, proportionality review enables us to meet our constitutional obligation to see that the death penalty is imposed only on the most extraordinary of criminals for the most extraordinary of crimes. *State v. Watson,* 129 Ariz. 60, 63, 628 P.2d 943, 946 (1981). *See also Gregg v. Georgia,* 428 U.S. 153, 187, 96 S.Ct. 2909, 2931–32, 49 L.Ed.2d 859 (1976) ("There is no question that death as a punishment is unique in its severity and irrevocability ... an extreme sanction, suitable to the most extreme of crimes").

Neither does proportionality review inject any additional "subjective variable" or "unbridled discretion." At 524, 517, 815 P.2d at 893, 886. Indeed, the Supreme Court has explicitly identified the comparison of sentences imposed on other criminals in the same jurisdiction as "objective criteria." *Solem,* 463 U.S. at 292, 103 S.Ct. at 3011. I am frankly unable to discern how comparing the circumstances of individual crimes and criminals adds to the subjectivity of an independent review that already requires us to determine whether the death penalty should be reduced because the mitigating circumstances "outweigh" the aggravating. At 521, 815 P.2d at 890. This "weighing," after all, is not performed on a scale but by judges using their judgment.

This means only that we should improve our procedures, not that we should abandon a tool that performs a unique function. Trial judges are intimately concerned only with the cases that come to their own courtrooms. It is impossible for them to compare the case before them with other cases that have never come before them. By statute (A.R.S. § 13–4031) and by practice, only this court reviews every Arizona case in which the death penalty has been imposed. The extra bit of effort for proportionality review provides added insight that sometimes results in affirmance of the death penalty and in other cases reduction. *Compare State v. Libberton,* 141 Ariz. 132, 685 P.2d 1284 (1984), *with State v. Fierro,* 166 Ariz. 539, 804 P.2d 72 (1990). Surely it is not too much to ask this court to compare the facts and circumstances of all the capital cases that come before it in an attempt to see that capital punishment is imposed with some degree of equality and consistency.

No human system can achieve perfection, especially when applying the abstract concept of "justice" to the stark reality of imposing the ultimate penalty. While the law may require us to play God by choosing who shall live and who shall die, I believe it is incumbent on us to recognize our own fallibility and use every method available to reduce our errors.

Thus, I join with Justice Cameron in believing that this court should continue with its current practice of proportionality reviews.